IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SABA MAHMOOD, individually and on behalf of all similarly situated individuals,<br><br>        Plaintiff,<br><br><br>   v.<br><br>BERBIX INC., a Delaware corporation,<br><br>        Defendant. | Case No. 1:22-cv-02456<br><br>Hon. Sharon J. Coleman, District Judge<br><br>Hon. Heather K. McShain, Magistrate Judge |

## **DEFENDANT BERBIX INC.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 2

    A.    Factual Allegations ......................................................................................... 2

    B.    The Illinois Biometric Information Privacy Act ("BIPA").................................... 3

    C.    Plaintiff's Claims .......................................................................................... 3

III.    LEGAL STANDARD.............................................................................................. 4

IV.    ARGUMENT ........................................................................................................... 4

    A.    Dismissal is required because BIPA does not apply extraterritorially ................. 4

    B.    Alternatively, dismissal is required under the Dormant Commerce Clause. ......... 7

    C.    Plaintiff's Section 15(c) and (d) claims fail as speculative and conclusory. ......... 9

    D.    BIPA's financial transaction exception bars Plaintiff's Section 15(d) claim.................................................................................................................. 10

    E.    Plaintiff's damages claim based on intentional or reckless conduct fails............ 11

V.    CONCLUSION....................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
499 F.3d 663 (7th Cir. 2007) ................................................................12

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)........................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................4

*Avery v. State Farm Mut. Auto. Ins. Co.*,
216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005) ........................................4, 5, 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................4, 9

*Carpenter v. McDonald's Corp.*,
No. 1:21-cv-02906, 2022 WL 897149 (N.D. Ill. Jan. 13, 2022)................9

*Daniel v. Cook Cnty.*,
833 F.3d 728 (7th Cir. 2016) ....................................................................9

*Graham v. Gen. U.S. Grant Post. No. 2665, V.F.W.*,
43 Ill.2d 1, 248 N.E.2d 657 (Ill. 1969) ....................................................5

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989)..................................................................................7

*Heard v. Becton, Dickinson & Co.*,
440 F. Supp. 3d 960 (N.D. Ill. 2020) ......................................................10

*Jacobs v. Hanwha Techwin Am., Inc.*,
No. 21 C 866, 2021 WL 3172967 (N.D. Ill. July 27, 2021) ...................10

*Kloss v. Acuant, Inc.*,
462 F. Supp. 3d 873 (N.D. Ill. 2020) ......................................................10

*McGoveran v. Amazon Web Servs., Inc.*,
No. 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) .....4, 5, 6, 7

*Morley-Murphy Co. v. Zenith Elecs. Corp.*,
142 F.3d 373 (7th Cir. 1998) .................................................................7, 8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Namuwonge v. Kronos, Inc.*,
   418 F. Supp. 3d 279 (N.D. Ill. 2019) ...............................................................10, 11

*Neals v. PAR Tech. Corp.*,
   419 F. Supp. 3d 1088 (N.D. Ill. 2019) ...................................................................6, 7

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ........................................................................................8

*Rogers v. BNSF Railway Co.*,
   No. 19 C 3083, 2022 WL 787955 (N.D. Ill. Mar. 15, 2022) ...................................10

*Rogers v. CSX Intermodal Terminals, Inc.*,
   409 F. Supp. 3d 612 (N.D. Ill. 2019) ........................................................................11

*Sam Francis Found. v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) (en banc) ...................................................................8

*Stalcup v. Veratad Techs. LLC*,
   No. 21-2291 (C.D. Ill. filed Nov. 26, 2021), ECF No. 1-1 ......................................9

*Tarzian v. Kraft Heinz Foods Co.*,
   No. 18 C 7148, 2019 WL 5064732 (N.D. Ill. Oct. 9, 2019) ......................................7

*Tims v. Black Horse Carriers, Inc.*,
   2021 IL App (1st) 200563, 184 N.E.3d 466 (Ill. App. Ct. 2021), *appeal
   allowed*, 452 Ill.Dec. 48, 184 N.E.3d 1029 (Ill. 2022) ...........................................10

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
   390 F. Supp. 3d 892 (N.D. Ill. 2019) ..........................................................................6

*Valley Air Svc. v. Southaire, Inc.*,
   No. 06-782, 2009 WL 1033556 (N.D. Ill. Apr. 16, 2009) .....................................4, 5

*Vulcan Golf, LLC v. Google Inc.*,
   552 F. Supp. 2d 752 (N.D. Ill. 2008) ..........................................................................7

*Walker v. S.W.I.F.T. SCRL*,
   491 F. Supp. 2d 781 (N.D. Ill. 2007) ..........................................................................6

*Wilson v. Dep't of Revenue*,
   169 Ill.2d 306, 662 N.E.2d 415 (Ill. 1986) ................................................................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes**

Illinois Biometric Information Privacy Act, 740 ILCS
  14/1 ...........................................................................................................8
  14/5 ......................................................................................................3, 11
  14/10 ....................................................................................................3, 11
  14/15 .......................................................................................3, 4, 9, 10, 11
  14/20 .........................................................................................................8

RCW 19.375.010 .............................................................................................8

Tex. Bus. & Com. Code § 503.001 ....................................................................8

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .........................................................4

## I.   INTRODUCTION

Plaintiff Saba Mahmood is an Illinois resident who filed a putative class action against Berbix Inc. ("Berbix"), an identity verification platform, for allegedly violating the Illinois Biometric Information Privacy Act ("BIPA"). All of Plaintiff's claims center on a single commercial transaction in August 2020, when she allegedly uploaded a photo of her driver's license and a "selfie" to rent a car online from SilverCar by Audi ("SilverCar"), which used Berbix's identity verification service.  Plaintiff's claims are fatally flawed because the alleged commercial transaction at the center of this lawsuit has absolutely no connection to Illinois. Because BIPA applies only to transactions that occur primarily and substantially within Illinois, the Complaint must be dismissed.

Plaintiff does not claim she was in Illinois when her biometrics allegedly were collected. She does not allege she was in Illinois when she registered for Texas-based SilverCar's service, or when she uploaded the photos from which California-based Berbix supposedly derived her biometrics.  Nor does she claim that Berbix extracted or stored her biometrics in Illinois.  The sole connection between the challenged transaction and Illinois is Plaintiff's residency, which is not sufficient.  Under the extraterritoriality doctrine, it is black letter law that a party's Illinois residency does not show that a challenged transaction occurred primarily and substantially in Illinois.  Otherwise, BIPA would apply to Illinois residents' out-of-state transactions, and the Dormant Commerce Clause—which forbids states from controlling conduct outside their boundaries—would then require dismissal.

Plaintiff presents only boilerplate allegations, on information and belief, that Berbix violated BIPA by profiting from and disclosing her biometric data, among other things. Similarly, she claims she is entitled to enhanced statutory damages because Berbix's alleged BIPA violations were "knowing and willful," but provides no supporting facts.   Courts

consistently dismiss such speculative and conclusory BIPA claims and damages demands. And even if Plaintiff had adequately alleged that Berbix disclosed her biometric data in an Illinois-based transaction, that claim would still fail because BIPA authorizes disclosure of biometric data to complete requested financial transactions, such as Plaintiff's rental car transaction.

The Court should dismiss the Complaint in full, with prejudice. Any amendment would be futile because: (1) BIPA does not apply to the alleged commercial transaction, with no connection to Illinois beyond Plaintiff's residence; and (2) even if BIPA applied, Plaintiff plainly lacks facts to support the claims she has pled on information and belief.

## II.   BACKGROUND

### A.   Factual Allegations[1]

Berbix provides identity verification services to companies in various industries by comparing an image of a person's photo ID (e.g., a driver's license or passport) with a separate photo of their face (a "selfie") to verify their identity. (*See* Notice of Removal, Ex. 1 ("Compl.") ¶¶ 3-5.) Plaintiff alleges that Berbix uses facial recognition technology to extract facial geometry scans from the two photos and compare them. (*Id.*)

In August 2020, Plaintiff registered with SilverCar, which required her to upload her driver's license and a selfie to Berbix's "identity-verification platform" before she could rent a car. (*Id.* ¶¶ 22-23.) Plaintiff alleges that Berbix "collected, stored, and analyzed [her] facial geometry" to "verify her age and identity." (*Id.* ¶ 24.) Plaintiff also claims, "on information and belief," that Berbix "then disclosed and/or disseminated" her biometric data to unnamed third parties "for data storage purposes in order to facilitate future transactions." (*Id.* ¶ 25.) Plaintiff similarly alleges only "on information and belief" that Berbix receives payment from its customers on a per-biometric transaction basis. (*Id.* ¶ 27.)

---

[1] This statement is based on the Complaint's allegations, which Berbix does not admit.

Plaintiff alleges that she "accessed the SilverCar app in Illinois" at some unspecified time. (*Id*. ¶ 22.) She does not allege that she uploaded her photo ID or selfie in Illinois. (*See id*.) Nor does she allege that Berbix extracted or stored her biometrics in Illinois. (*See id*.)

### B. The Illinois Biometric Information Privacy Act ("BIPA")

BIPA, which the Illinois legislature enacted in 2008 to address growing use of biometrics, regulates "biometric identifiers" and "biometric information" (collectively, "biometric data"). 740 ILCS 14/5, 14/10. A "biometric identifier" is a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. "Biometric information" is "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id*. Data that is neither a "biometric identifier" nor "biometric information" is unregulated by BIPA. *See id*.

BIPA imposes specific requirements on private entities that acquire biometric data. As relevant here, before a private entity may "collect, capture, purchase, receive through trade, or otherwise obtain" biometric data, it must provide written notice of the "specific purpose and length of term" for which the biometric data is being "collected, stored, and used," and obtain "a written release." 740 ILCS 14/15(b). Moreover, a private entity "in possession of" biometric data may not (1) "sell, lease, trade, or otherwise profit from" that data, 740 ILCS 14/15(c), or (2) "disclose, redisclose, or otherwise disseminate" that data except in enumerated circumstances, including where the individual consents or the disclosure is necessary to complete a requested financial transaction, 740 ILCS 14/15(d).

### C. Plaintiff's Claims

Plaintiff alleges that Berbix violated 740 ILCS 14/15(b) by failing to procure her written consent to obtain her biometrics. (Compl. ¶ 26.) She further alleges, "on information and belief," that Berbix "unlawfully profited" from obtaining her biometrics in violation of 740 ILCS

14/15(c), because it is paid by clients "on a per-biometric-transaction basis." (*Id*. ¶ 27.) Finally, she alleges—also "on information and belief"—that Berbix violated 740 ILCS 14/15(d) by providing her biometrics "to third parties for data storage purposes in order to facilitate future transactions." (*Id*. ¶ 25.) She seeks to represent a class of "[a]ll individuals whose biometrics were captured, collected, stored, used, transmitted, and/or disseminated by [Berbix] or its technology within the state of Illinois any time within the applicable limitations period." (*Id*. ¶ 29.)

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state a claim for relief that is facially "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A pleading must contain factual content that allows the court to "reasonabl[y] infer[]" the defendant's liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals" of the claim's elements, "supported by mere conclusory statements, do not suffice." *Id.*

## IV. ARGUMENT

### A. Dismissal is required because BIPA does not apply extraterritorially

The Complaint should be dismissed because it does not allege that Plaintiff's challenged transaction occurred primarily and substantially within Illinois, as required to state a BIPA claim.

An Illinois statute cannot impose liability for out-of-state conduct unless its "express provisions" show the Legislature intended it to apply extraterritorially. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 185, 835 N.E.2d 801, 852 (Ill. 2005) (internal quotations omitted). BIPA contains no such provision, *McGoveran v. Amazon Web Servs., Inc.*, No. 20-1399-LPS, 2021 WL 4502089, at *3 (D. Del. Sept. 30, 2021), and thus applies only if "the circumstances relat[ed] to the transaction occur[red] primarily and substantially within [Illinois]." *See Avery*, 216 Ill.2d at 186, 835 N.E.2d at 853; *McGoveran*, 2021 WL 4502089, at *3; *cf. Valley Air Svc. v.*

*Southaire, Inc.*, No. 06-782, 2009 WL 1033556, at *12 (N.D. Ill. Apr. 16, 2009) (dismissing claim brought by "Illinois citizen" who "communicated with [the defendant] from Illinois" and "felt injury in Illinois," because the circumstances "at the heart of [the] claim" "occurred in Arkansas"); *Graham v. Gen. U.S. Grant Post. No. 2665, V.F.W.*, 43 Ill.2d 1, 4, 248 N.E.2d 657, 659 (Ill. 1969) (Illinois resident could not invoke state's Dram Shop Act against Illinois liquor stores where out-of-state accident caused dispute). A plaintiff's Illinois residency does not independently satisfy this test. *Valley Air*, 2009 WL 1033556, at *12 (construing *Avery*).

This case is similar to *McGoveran*, where the court dismissed BIPA claims against an out-of-state service provider under the extraterritoriality doctrine. 2021 WL 4502089, at *6. The Illinois plaintiffs alleged that when they placed calls from Illinois to a non-party company, their voices were recorded by a Georgia-based company, which generated voiceprints that were stored on servers operated by Washington-based Amazon Web Services. *Id*. at *2. Both defendants allegedly violated BIPA. *Id*.

The court dismissed on extraterritoriality grounds because plaintiffs did not allege that defendants "did anything in Illinois." *Id*. at *1, *4. Although plaintiffs alleged that they had placed calls from Illinois, they did not claim that their voiceprints were "created, processed, or stored . . . in Illinois." *Id*. at *4. The court also rejected plaintiffs' argument that defendants' alleged failures to provide notice of, and obtain consent to, biometrics collection "necessarily occurred in Illinois," as it made "no sense to assign a location for an act that did not occur[.]" *Id*. Even "more fundamentally," the BIPA claims' only connection to Illinois was "plaintiff[s]' residency," which was "not enough to establish an Illinois connection" to "survive…dismiss[al] based on extraterritoriality." *Id*. The court rejected plaintiffs' argument that BIPA governs all collections of biometric data from Illinois residents, because it was "overly broad and ultimately

untenable," and "could impose liability on a vast number of corporations who do no business in Illinois and who lack any other significant connection to Illinois." *Id*. at *6. This was especially true because plaintiffs only interacted directly with an out-of-state non-party company, which in turn interacted with defendants. *Id*. at *5.

Plaintiff's claims fail for the reasons set forth in *McGoveran*. She alleges that she "accessed the SilverCar app in Illinois" at an unspecified point (Compl. ¶ 22), but she does not claim that she uploaded the photos allegedly used to obtain her biometrics in Illinois. Instead, the Complaint alleges BIPA violations where Plaintiff—while ostensibly outside of Illinois— uploaded photos through Texas-based SilverCar's app, which photos California-based Berbix supposedly used to extract biometric data.

Similar to *McGoveran*, the Complaint here does not allege direct interactions between Plaintiff and Berbix, claim that Berbix extracted or stored Plaintiff's biometrics in Illinois, or describe any ties between Berbix and Illinois—and the only identified nexus between Illinois and this alleged transaction is Plaintiff's residency, which does not suffice. (*See* Compl. ¶ 17); *McGoveran*, 2021 WL 4502089, at *3; *see also Walker v. S.W.I.F.T. SCRL*, 491 F. Supp. 2d 781, 795 (N.D. Ill. 2007) (dismissing statutory claim on extraterritoriality grounds where Illinois plaintiffs did not allege transaction's "substantial connection to Illinois" beyond their residence); *Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1091 (N.D. Ill. 2019) (dismissing Illinois resident's BIPA claim for failure to allege that the defendant collected her fingerprint **in Illinois**).

Even beyond the BIPA context, Illinois courts dismiss statutory claims under the extraterritoriality doctrine where, as here, there are insufficient allegations of a nexus between the challenged transaction and the state. *See U.S. Bd. of Oral Implantology v. Am. Bd. of Dental*

*Specialties*, 390 F. Supp. 3d 892, 911 (N.D. Ill. 2019) (dismissing because Illinois plaintiffs-corporations failed to satisfy *Avery* test, where they alleged an actionable misrepresentation in a document prepared in Illinois, but did not allege that document was published in Illinois or geared towards in-state audience); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 775 (N.D. Ill. 2008) (dismissing claim challenging online scheme where plaintiffs' residency was only Illinois nexus); *Tarzian v. Kraft Heinz Foods Co.*, No. 18 C 7148, 2019 WL 5064732, at *3 (N.D. Ill. Oct. 9, 2019) (dismissing Illinois consumer fraud claims based on absence of Illinois connection). Dismissal is required here for the same reasons. *See McGoveran*, 2021 WL 4502089, at *4–6; *Neals*, 419 F. Supp. 3d at 1091.

**B.      Alternatively, dismissal is required under the Dormant Commerce Clause.**

Even assuming, for the sake of argument, that the extraterritoriality doctrine does not foreclose Plaintiff's claims, then as applied, BIPA would violate the Dormant Commerce Clause, which prohibits states from enacting legislation that "project[s]" their "regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-37 (1989). The Dormant Commerce Clause "precludes the application of a state statute" that has "the practical effect" of "control[ling] conduct beyond the boundaries of the State," "whether or not the commerce has effects within the State." *Id*. at 336. Otherwise, "any state that has chosen a policy more *laissez faire* than [another state's] would have its choices stymied, because the state that has chosen more regulation could always trump its deregulated neighbor." *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998). This is particularly true where, as applied here, states seek to regulate online conduct. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99, 104 (2d Cir. 2003) (Vermont law that prohibited the distribution of sexually explicit materials to minors and "extended to internet communications" was a "per se violation of the dormant Commerce Clause" because the "practical effect" of Vermont's effort to regulate

online conduct was to "project[] its legislation into other States, and directly regulate[] commerce therein"); *cf. PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (finding that Dormant Commerce Clause barred Virginia law regulating publication of certain material online and noting that "[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material . . . can be construed to have only a local effect.")

Only three states have enacted biometrics statutes. *See* 740 ILCS 14/1 *et seq.* (BIPA); Tex. Bus. & Com. Code § 503.001 (Texas Capture or Use of Biometric Identifier Act); RCW 19.375.010 (Washington biometrics law). Of those, Illinois alone has provided a private right of action. *See* 740 ILCS 14/20. Apart from her residency, which is not sufficient, Plaintiff alleges no connection between Illinois and the challenged transaction. *See* Section IV.A, *supra*. Permitting Plaintiff's claims to proceed would mean that online transactions occurring wholly outside of Illinois would give rise to BIPA liability whenever they involve an Illinois resident. Any such construction of BIPA would frustrate the policy decisions of the 49 states that have declined to regulate biometrics directly or at all, or have tasked only the state Attorney General with enforcement—and thus violate the Dormant Commerce Clause as applied. *See Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) ("easily conclud[ing]" that a state statute violated the Dormant Commerce Clause because it regulated sales that had "no necessary connection with the state other than the residency of the seller"); *see generally Morley-Murphy*, 142 F.3d at 379. The only way to construe BIPA consistent with the canon that statutes are "presum[ed] … to be constitutional" and must be construed "so as to uphold their validity whenever it is reasonably possible to do so," would be to avoid a construction that applies BIPA based on a plaintiff's Illinois residency alone. *See Wilson v. Dep't of Revenue*, 169 Ill.2d 306, 310, 662 N.E.2d 415, 417 (Ill. 1986). Because permitting Plaintiffs' claims to

proceed would violate the Dormant Commerce Clause, the Court should dismiss the Complaint.

**C.    Plaintiff's Section 15(c) and (d) claims fail as speculative and conclusory.**

Plaintiff's Section 15(c) and (d) claims fail for the additional reason that they are both speculative and conclusory: Plaintiff merely parrots the statutory elements—and does so on information and belief.

Section 15(c) prohibits a private entity from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from" biometric data in its possession.  740 ILCS 14/15(c).  Plaintiff's 15(c) claim speculates that Berbix "unlawfully profited" from her biometrics because, "on information and belief, [Berbix] is paid by its clients for access to [its] facial recognition and matching platform on a per-biometric-transaction basis."  (Compl. ¶ 27.)  Section 15(d) prohibits a private entity from "disclos[ing], redisclos[ing], or otherwise disseminat[ing]" a person's biometric data unless, as relevant here, the entity obtains the person's consent or uses the data to complete a financial transaction requested by that person.  *See* 740 ILCS 14/15(d).  Plaintiff's Section 15(d) claim speculates, also "on information and belief," that Berbix "disclosed and/or disseminated Plaintiff's biometric data" to unspecified "third parties for data storage purposes in order to facilitate future transactions."  (Compl. ¶ 25; *see also id*. ¶ 41.)

Courts consistently dismiss BIPA claims—including those brought by the same attorneys here[2]—that are (1) conclusory, providing only a "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, or (2) speculative, pled only on information and belief. *See, e.g., Carpenter v. McDonald's Corp.*, No. 1:21-cv-02906, 2022 WL 897149, at *4 (N.D. Ill.

---

[2] Indeed, Plaintiff's counsel appear to have copied and pasted the Section 15(d) allegations near-verbatim from a BIPA complaint they filed against an identity verification company last year. *Compare* Compl. ¶¶ 25, 41 *with Stalcup v. Veratad Techs. LLC*, No. 21-2291 (C.D. Ill. filed Nov. 26, 2021), ECF No. 1-1 ¶¶ 31, 47; *see generally Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of the . . . contents of filings in other courts.").

Jan. 13, 2022) (dismissing Section 15(d) claim pled on information and belief by Plaintiff's counsel because the "allegations regarding disclosure, redisclosure, or dissemination are conclusions that parrot BIPA's language"); *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 969 (N.D. Ill. 2020) (dismissing Section 15(d) claim pled on "information and belief" for "rank speculation"); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 285 (N.D. Ill. 2019) (similar) (Coleman, J.); *Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967, at *4 (N.D. Ill. July 27, 2021) (similar); *Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 877 (N.D. Ill. 2020) (dismissing Section 15(a), (b), and (d) claims where plaintiff provided only "barebone (sic) factual support and recitation of statutory language"). Plaintiff's 15(c) and 15(d) claims, which simply recite the statutory elements and are pled solely "on information and belief," must be dismissed.[3]

## D. BIPA's financial transaction exception bars Plaintiff's Section 15(d) claim.

BIPA's "financial transaction" exception would bar Plaintiff's Section 15(d) claim, even were it adequately pled. Section 15(d) permits a company to disclose or disseminate biometric data under certain enumerated circumstances, including to "complete[] a financial transaction requested or authorized by the subject of the biometric [data]." 740 ILCS 14/15(d).

Plaintiff alleges that SilverCar required her to use Berbix's "identity and age-verification process" to complete a "purchase" that she both requested and authorized—specifically, "to

---

[3] Additionally, Plaintiff alleges that she registered with SilverCar in August 2020, then uploaded her driver's license and selfie to Berbix's platform. Compl. ¶ 23. This allegedly occurred more than one year before she filed her complaint in state court on April 1, 2022. *See generally* Compl. While Plaintiff does not identify when the alleged 15(c) and (d) violations happened, they are barred by the one-year statute of limitations to the extent they accrued before April 1, 2021. *See Tims v. Black Horse Carriers, Inc.*, 2021 IL App (1st) 200563, 184 N.E.3d 466, 473 (Ill. App. Ct. 2021), *appeal allowed*, 452 Ill.Dec. 48, 184 N.E.3d 1029 (Ill. 2022) (a one-year limitations period applies to claims under BIPA Sections 15(c) and 15(d)); *see also Rogers v. BNSF Railway Co.*, No. 19 C 3083, 2022 WL 787955, at *7 (N.D. Ill. Mar. 15, 2022) (*Tims* continues to govern BIPA statute-of-limitations periods).

obtain a rental car." (Compl. ¶¶ 4, 22-23.) This was a "financial transaction" under BIPA. *See, e.g.*, 740 ILCS 14/5(b) (BIPA applies to "biometric-facilitated financial transactions" like purchases at "grocery stores, gas stations, and school cafeterias"). Thus, the financial transaction exception also requires dismissal of Plaintiff's Section 15(d) claim.

### E. Plaintiff's damages claim based on intentional or reckless conduct fails.

Plaintiff seeks enhanced statutory damages of $5,000 per violation, baldly alleging that the supposed BIPA violations "were knowing and willful, or were at least in reckless disregard of the statutory requirements." (Compl. ¶ 46, Prayer for Relief (d).) Her failure to plead facts detailing Berbix's allegedly willful or reckless conduct requires dismissal of her claim for enhanced damages. *See, e.g.*, *Namuwonge*, 418 F. Supp. 3d at 286 (Coleman, J.) (dismissing BIPA enhanced damages claim where plaintiff made only "abstract statements regarding damages," without "any substantive details regarding whether the allegations were reckless or intentional"); *Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 618-19 (N.D. Ill. 2019) (dismissing BIPA enhanced damages claim brought by Plaintiff's counsel's firm because complaint's "conclusory statement of [defendant's] intent" was "insufficient . . . to infer that [defendant] acted intentionally or recklessly" and "d[id] nothing to distinguish this case from every possible BIPA case where the defendant is alleged to have failed to meet the strictures of Section 15"). For these reasons, Plaintiff is not entitled to enhanced statutory damages.

## V. CONCLUSION

The Court should grant Berbix's motion to dismiss with prejudice. The Complaint is fatally defective as a matter of law because it seeks to impose BIPA liability for an alleged commercial transaction with no connection to Illinois apart from Plaintiff's residency. Moreover, Plaintiff plainly lacks a factual basis to allege the Section 15(c) and (d) claims that she pled on information and belief: if she had such facts, she would have alleged them. Because

any amendment would be futile, the dismissal should be with prejudice. *See, e.g.*, *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007) (affirming denial of leave to amend complaint where amendment would have been futile).

Dated:  June 10, 2022

Respectfully submitted,

COOLEY LLP

By: */s/ Tiana A. Demas*
     Tiana A. Demas

By Its Attorneys

Robert E. Earles (6308936)
(rearles@cooley.com)
Tiana A. Demas (admitted *pro hac vice*)
(tdemas@cooley.com)

COOLEY LLP
110 N. Wacker Drive, 42nd Floor
Chicago, IL 60606
Telephone:   +1 312 881 6500

Bethany C. Lobo (admitted *pro hac vice*)
(blobo@cooley.com)
Joseph D. Mornin (admitted *pro hac vice*)
(jmornin@cooley.com)
Wazhma Sadat (admitted *pro hac vice*)
(wsadat@cooley.com)

COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA  94111-4004
Telephone:   +1 415 693 2000

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a true and correct copy of the forgoing

Defendant Berbix Inc.'s Motion to Dismiss was served on June 10, 2022, via the Court's ECF

system to all counsel of record.

<div align="right">

/s/ Tiana A. Demas

</div>

# <u>Appendix – Unpublished Cases</u>

2022 WL 897149
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Shannon CARPENTER, individually and
on behalf of similarly situated
individuals, Plaintiff,
v.
MCDONALD'S CORPORATION,
Defendant.

Case No. 1:21-cv-02906
|
Signed 01/13/2022

**Synopsis**
**Background:** Customer brought putative class action
against fast food restaurant, asserting violation of Illinois
Biometric Information Privacy Act (BIPA) by collecting
customers' voiceprint biometrics via artificial intelligence
(AI) voice assistant technology in drive-through lanes and
storing, disclosing, and disseminating biometric
information without customers' consent. Restaurant
moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Charles Ronald Norgle, J.,
held that:

[1] patent for fast food restaurant's AI voice assistant
technology was appropriate to consider on restaurant's
motion to dismiss; and

[2] customer plausibly alleged that restaurant collected
customers' voiceprint biometrics via AI voice assistant
technology; but

[3] allegations failed to state claim for violation of BIPA
provision prohibiting disclosing, redisclosing, or
otherwise disseminating biometric information without
consent.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (9)

**[1]** **Federal Civil Procedure** ⚖ Insufficiency in
general

To withstand motion to dismiss for failure to
state a claim, complaint must provide sufficient
plausible facts to put defendant on notice of the
claims against him. Fed. R. Civ. P. 8(a),
12(b)(6).

**[2]** **Federal Civil Procedure** ⚖ Insufficiency in
general

To withstand motion to dismiss for failure to
state a claim, complaint must provide enough
factual information to state a claim to relief that
is plausible on its face and raise a right to relief
above a speculative level. Fed. R. Civ. P. 8(a),
12(b)(6).

**[3]** **Federal Civil Procedure** ⚖ Claim for relief in
general

Pleading rule requiring that the complaint
contain a short and plain statement of the claim
showing that the pleader is entitled to relief
demands more than an unadorned,
the-defendant-unlawfully-harmed-me
accusation. Fed. R. Civ. P. 8(a).

**[4]** **Federal Civil Procedure** ⚖ Insufficiency in
general

Claim has facial plausibility, as required to
withstand a motion to dismiss for failure to state

a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 8(a), 12(b)(6).

**[5]**  **Federal Civil Procedure** Construction of pleadings
**Federal Civil Procedure** Matters deemed admitted;  acceptance as true of allegations in complaint

In reviewing a plaintiff's claim on motion to dismiss for failure to state a claim, court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote

**[6]**  **Records** Biometric information

"Biometric identifier," within meaning of Illinois Biometric Information Privacy Act (BIPA), is a unique personal feature that can be used to identify a person. 740 Ill. Comp. Stat. Ann. 14/5, 14/10.

**[7]**  **Evidence** Matters referred to or incorporated by pleadings
**Federal Civil Procedure** Matters considered in general

Patent for fast food restaurant's artificial intelligence (AI) voice assistant technology in drive-through lanes was appropriate to consider on restaurant's motion to dismiss for failure to state a claim in customer's putative class action asserting violation of Illinois Biometric Information Privacy Act (BIPA) by collecting customers' voiceprint biometrics via voice

assistant technology and storing, disclosing, and disseminating biometric information without customers' consent, since patent was referenced in the complaint and central to customer's allegations. 740 Ill. Comp. Stat. Ann. 14/15(b), 14/15(d); Fed. R. Civ. P. 10(c), 12(b)(6).

**[8]**  **Records** Biometric information

Customer plausibly alleged that fast food restaurant collected customers' voiceprint biometrics via artificial intelligence (AI) voice assistant technology in drive-through lanes, as required to state claim in putative class action for violation of Illinois Biometric Information Privacy Act (BIPA) provision prohibiting collecting biometric identifier without consent, by alleging that restaurant's AI voice assistant was able to extract voice information including pitch, volume, and duration along with identifying information like age, gender, nationality, and national origin, and that the AI voice assistant utilized an acoustic model trained to receive an input comprising acoustic features from an audio waveform that represented an utterance of a speaker, and that restaurant used the AI and data to actually identify unique individuals. 740 Ill. Comp. Stat. Ann. 14/15(b).

**[9]**  **Records** Pleading, petition, application, or motion

Customer's allegations that fast food restaurant disclosed customers' voiceprint biometric data that it collected via artificial intelligence (AI) voice assistant technology in drive-through lanes, which merely parroted the language of Illinois Biometric Information Privacy Act (BIPA) without factual support, failed to state claim for violation of BIPA provision prohibiting disclosing, redisclosing, or otherwise disseminating biometric information without consent. 740 Ill. Comp. Stat. Ann. 14/15(d).

**Attorneys and Law Firms**

Andrew T. Heldut, Colin Primo Buscarini, Eugene Y. Turin, Timothy Patrick Kingsbury, McGuire Law, P.C., Chicago, IL, for Plaintiff.

Michael J. Gray, Efrat R. Schulman, Jennifer Wilcynski Plagman, Katherine Stallings Bailey, Thomas W. Ritchie, Jones Day, Chicago, IL, for Defendant.

**ORDER**

CHARLES RONALD NORGLE, Judge

**\*1** Defendant's motion to dismiss for failure to state a claim [15] is granted in part and denied in part. Plaintiff's Section 15(d) claim is dismissed without prejudice.

**MEMORANDUM OPINION**

Plaintiff Shannon Carpenter brings this putative class action against Defendant McDonald's Corporation ("McDonald's") pursuant to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq. ("BIPA" or the "Act"). According to Plaintiff, McDonald's deploys an artificial intelligence voice assistant in the drive-through lanes of various McDonald's restaurants that uses voice recognition technology to allow customers to place orders without interacting with a person. Plaintiff brings a single count against Defendant, alleging that McDonald's violates BIPA by collecting customers' voiceprint biometrics via the voice assistant technology and storing, disclosing, and disseminating biometric information without their customers' consent. Defendant has filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing in part that Plaintiff's complaint does not allege sufficient facts to plausibly allege that McDonald's collects its customers' voiceprints whatsoever. The Court agrees that Plaintiff does not sufficiently plead a claim pursuant to 740 ILCS 14/15(d), so that claim is dismissed

without prejudice. However, Plaintiff's allegations plausibly state a claim pursuant to 740 ILCS 14/15(b), so the Court finds that Plaintiff's complaint is sufficient at this early stage of litigation. Discovery should proceed expeditiously.

**I. Standard**

[1] [2] [3] [4] [5]To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554-557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This statement must provide sufficient plausible facts to put a defendant on notice of the claims against him. Brooks v. Ross, 578 F. 3d 574, 581 (7th Cir. 2009). The complaint "must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above a speculative level.' " Doe v. Village of Arlington Heights, 782 F.3d 911, 914 (7th Cir. 2015) (quoting Twombly, 550 U.S. at 555, 570, 127 S.Ct. 1955). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citations and quotation marks omitted). In reviewing a plaintiff's claim, the court "must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011).

**II. Background**

[6]In passing BIPA, the Illinois Legislature stated that "biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, even sensitive information like Social Security numbers can be changed. Biometrics, however, are biologically unique to each individual and, once compromised, such individual has no recourse, is at a heightened risk for identity theft, and is likely to withdraw from biometric facilitated transactions." 740 ILCS 14/5. "Biometrics" in the Act refers to "biometric identifiers" and "biometric information." BIPA defines "biometric identifier" by listing examples, including "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face

geometry." 740 ILCS 14/10. In other words, a biometric identifier is a unique personal feature that can be used to identify a person. Rivera v. Google Inc., 238 F. Supp. 3d 1088, 1096 (N.D. Ill. 2017) (biometric identifier, including a voiceprint, "is a set of measurements of a specified physical component ... used to identify a person."). The term "biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. BIPA does not define the term "voiceprint," but the dictionary defines it as a "distinctive pattern of curved lines and whorls made by a machine that measures human vocal sounds for the purpose of identifying an individual speaker." Voiceprint, Black's Law Dictionary (11th ed. 2019). Therefore, as the Illinois Office of the Attorney General states, "a voiceprint, which is a record of mechanical measurement, is not the same as a simple recording of a voice." Public Access Opinion No. 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017). As relevant here, the Act states that: (1) "No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information" without informed consent. 740 ILCS 14/15(b) ("Section 15(b)"); and (2) "No private entity in possession of a biometric identifier or biometric information may disclose, rediclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information," subject to limited exceptions. 740 ILCS 14/15(d) ("Section 15(d)").[1]

---

[1] Plaintiff's complaint makes claims pursuant to 740 ILCS 14/15(a) and 740 ILCS 14/15(c) as well, but the Court remanded those claims to the Circuit Court of Cook County, Illinois. Dkt. 25.

---

**\*2** Plaintiff makes the following relevant allegations in his complaint. Dkt. 1-1 at 5-12. In 2019, McDonald's purchased the technology company "Apprente," which specialized in creating artificial intelligence ("AI") voice assistants that utilize machine learning and intelligent AI to interpret and understand individuals' voice interactions. Compl. ¶ 16. In addition, "[u]nlike common 'speech-to-text' systems that simply transcribe voice interactions into a useable transcript that is then interpreted, Apprente's technology uses 'speech-to-meaning' technology that analyzes speech signals in real-time to obtain a 'result.' " Id. ¶ 18. McDonald's employs the AI at certain drive-through restaurants. Because the AI's voice recognition technology allows customers to place orders without any actual human interaction, it helps McDonald's reduce staff requirements and streamline operations. See id. ¶ 20 (alleging that McDonald's incorporates

"machine-learning routines" that combine voiceprint recognition with license plate scanning technology "to identify unique customers regardless of which location they visit and present them certain menu items based on their past visits."). The AI voice assistant allegedly "collects customers' voiceprint biometrics in order to be able to correctly interpret customer orders and to identify repeat customers to provide a tailored experience" and "determine[s] such unique features of the customer's voice as pitch, volume, duration, as well as to obtain identifying information such as the customer's age, gender, accent, nationality, and national origin." Compl. ¶¶ 8, 19. Crucially, McDonald's allegedly "does not notify its customers" that "their voiceprint biometric information is being used and collected, nor does McDonald's obtain their consent to do so." Id. ¶ 9. Plaintiff asserts that he had his voiceprint biometrics collected without his consent when he visited a McDonald's restaurant in Lombard, Illinois in early 2020 and interacted with the AI voice assistant.

### III. Discussion

Defendant argues that the allegations and sources in the complaint make clear that Defendant's technology does not obtain biometric identifiers or information and that McDonald's in fact did not collect his voiceprint. Relatedly, Defendant asserts that Plaintiff fails to sufficiently plead facts to support his allegations that McDonald's collects voiceprints. Defendant first points to the patent for its AI technology, which it argues belies any allegations made by the technology identifies the individual speaking or extracts biometrics. Dkt. 16-1 (Exhibit A, U.S. Patent No. 10,555,299) ("the Patent"). Instead, says Defendant, the Patent merely describes "a software program that interprets and responds to statements made by users in ordinary natural language." Dkt. 16-1 at 5. McDonald's states the technology uses machine learning—a form of artificial intelligence—to train software to recognize speech and imitate intelligent human behaviors, but does not extract biometrics. Although Defendant states that the Patent "discloses methods for modifying synthetic training data by ... identifying speaker characteristics such as accents, speech patterns, gender, age, etc.," Defendant says the technology only takes vocal utterances and creates the information necessary to initiate a food order in accordance with the speaker's intent. Dkt. 16 at 3 (citing the Patent at 6-7). Neither does the Patent disclose any use of license plate scanning or any other technology to identify unique customers at the drive-through. Id.

[7]As an initial matter, Plaintiff's complaint references the Patent by citing to it with a hyperlink, and the Patent is central to Plaintiff's allegations. Compl. ¶ 19 n.2; see, e.g., dkt. 27 (Response Brief) at 5 (Plaintiff argues that the Patent explains the AI's extraction of biometric data points by describing the voice assistant as a "conversational agent that utilizes an 'acoustic model ... trained to ... output sequences of non-phonemic or prosodic features' such as 'pitch, volume, duration, and so on.' ") (quoting the Patent). The Patent is therefore appropriate to consider on the present 12(b)(6) motion. Fed. R. Civ. P. 10(c); Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012); Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss."); see Zablocki v. Merchants Credit Guide Co., 968 F.3d 620, 623 (7th Cir. 2020) ("when the plaintiff relies on a document attached to the complaint and does not deny its accuracy, the facts communicated by that document control over allegations to the contrary.").

While the Court accepts the Patent as appropriate to consider at this stage of litigation, the Court cannot conclude as a matter of law that Defendant does not collect voiceprints via its AI voice assistant technology. True, voice characteristics like pitch, volume, duration, accent and speech pattern, and other characteristics like gender, age, nationality, and national origin—individually—are not biometric identifiers or voiceprints. They surely can help confirm or negate a person's identity, but one cannot be identified uniquely by these characteristics alone, so they cannot constitute a "set of measurements of a specified physical component ... used to identify a person." Rivera v. Google Inc., 238 F. Supp. 3d 1088, 1096 (N.D. Ill. 2017). But the fact that the Patent states that the technology may capture characteristics like accent, speech pattern, gender, or age for the purpose of training the AI does not preclude the possibility that the technology allows McDonald's to collect, collate, or "otherwise obtain" a voiceprint. 740 ILCS 14/15(b).

*3 [8]Ultimately, the Court finds that Plaintiff has alleged enough factual content to plausibly allege that Defendant collected his voiceprint. The fact that the technology can effectively interpret and understand customer orders shows that it detects and analyzes human speech in a way that a mere recording device does not. Plaintiff alleges that Defendant's AI voice assistant is able to extract voice information including pitch, volume, and duration along

with identifying information like age, gender, nationality, and national origin. Compl. ¶¶ 8, 17, 19. Defendant argues that Plaintiff provides no facts supporting the claim that the AI collects pitch, volume, or duration, or is trained to recognize accents, speech patterns, gender, age, nationality, and geographic region. But those claims are not legal conclusions and the Court "must construe all of the plaintiff's factual allegations as true." Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011). Plaintiff also highlights that the AI voice assistant utilizes an "acoustic model ... trained to receive an input comprising acoustic features from an audio waveform that represents an utterance of a speaker," which bolsters Plaintiff's claim that the AI performs mechanical measurement. Dkt. 27 at 5 (citing the Patent at 6). Plaintiff states that an audio waveform is a graphical representation, measurement, or illustration of acoustic patterns. Dkt. 27 at 5 n.2. And Defendant admits that the technology can "learn to recognize speech" and "output a sequence of phonemes." Dkt. 16 at 2. Finally, and importantly, Plaintiff alleges that McDonald's uses the AI and data to actually identify unique individuals. Compl. ¶ 20 (alleging AI is used "to identify unique customers regardless of which location they visit and present them certain menu items based on their past visits."; id. ¶ 8 (alleging that the AI collects voiceprints "to identify repeat customers to provide a tailored experience.").

Based on the facts pleaded in the complaint, including the referenced Patent, it is reasonable to infer—though far from proven—that Defendant's technology mechanically analyzes customers' voices in a measurable way such that McDonald's has collected a voiceprint from Plaintiff and other customers. Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011) (the court "must draw all reasonable inferences in the plaintiff's favor."). Discovery may show that Defendant's technology cannot or does not collect any vocal information that could be used to uniquely identify an individual, in which case summary judgment may be appropriate. But Plaintiff has alleged sufficient factual information to make a plausible claim at this early stage. Supreme Auto Transp. LLC v. Arcelor Mittal, 238 F. Supp. 3d 1032, 1036 (N.D. Ill. 2017) ("A complaint should not be dismissed for failure to state [a] claim unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle the plaintiff to relief.")[2]

2    To the extent that Defendant argues that it must have actually used Plaintiff's voiceprint and "identified him as speaking to the voice assistant" to implicate BIPA, the Court disagrees. In the Court's view, pursuant to the plain language of the statute, a defendant may violate BIPA by collecting a voiceprint that merely *could* be used to identify a plaintiff. The collection of a

voiceprint—which is explicitly included in the definition of "biometric identifier"—without consent, even if not collected for the purpose of identifying that person, is a violation of the statute. 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first" obtains consent); 740 ILCS 14/10 (" 'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry."); see Vance v. Int'l Bus. Machines Corp., No. 20 C 577, 2020 WL 5530134, at *5 (N.D. Ill. Sept. 15, 2020) ("Plaintiffs allege that IBM extracted biometric information from photographs to create their DIF Dataset. The DIF Dataset includes biometric measurements that can be used to identify Plaintiffs. Thus, IBM's alleged actions implicate BIPA ... what's important is the potential intrusion on privacy posed by the unrestricted gathering of biometric information.").

Defendant cites Namuwonge v. Kronos, Inc., 418 F. Supp. 3d 279 (N.D. Ill. 2019) and Heard v. Becton, Dickinson & Co., 440 F. Supp. 3d 960 (N.D. Ill. 2020) in support of its argument that Plaintiff's pleading is insufficient to support its Section 15(b) and Section 15(d) claims. In Namuwonge, the court held that the plaintiff failed to allege a plausible section 15(b) claim against a third-party vendor (a timekeeping tracking company) that collected information based on plaintiff clocking in via her fingerprints as required by her employer. 418 F. Supp. 3d at 286. The court reasoned that the complaint's allegations made clear that it was the employer, not the vendor itself, that collected the biometric data. In Heard, the plaintiff sued the manufacturer of a medication dispensing device that dispensed medication when a medical employee provided his or her fingerprint. The court originally dismissed the plaintiff's Section 15(b) claim because Section 15(b), as opposed to Sections 15(a), (c), (d), and (e) of BIPA, applies only to entities that "collect, capture, purchase, receive through trade, or otherwise obtain" biometrics, rather than entities that are merely "in possession of" biometrics. 740 ILCS 14/15(a)-(e). The court held therefore that Section 15(b) only applies to entities that "take an active step" to collect biometrics. 440 F. Supp. 3d at 966. Because the plaintiff had not alleged "how, when, or any other factual detail" regarding the defendant manufacturer's active collection, the claim failed. Id. Further, in dismissing the Section 15(a) and Section 15(d) claims, the court found the allegation that the defendant "subsequently stored [the] fingerprint in their systems" inadequate to allow the court to draw the reasonable inference that the defendant was "in possession of" the biometric data. Id. at 968 (plaintiff failed to allege that the defendant "exercised *any* dominion or control over [his] biometric data ... or that it

held that data at its disposal ... [the allegation] does not say whether [the defendant] could freely access the data or even how [the defendant] allegedly received it.") (cleaned up) (emphasis in original).

**\*4** Defendant argues that Plaintiff here similarly does not allege that the McDonald's technology used biological characteristics or measured his vocal sounds to verify his identity. But unlike Namuwonge and Heard, Plaintiff here is not suing a third party or manufacturer. He alleges that Defendant used the technology to directly collect biometrics from individual customers and to uniquely identify them. McDonald's allegedly owns the technology company Apprente that specialized in creating AI voice assistants, so Plaintiff here has alleged more facts, which allow the plausible inference that McDonald's exercises control over the data. "In contrast to Namuwonge and consistent with the reasoning of Heard II, the [complaint] here asserts that [McDonald's] collects the data for its own use." Naughton v. Amazon.com, Inc., No. 20-CV-6485, 2022 WL 19324, at *3 (N.D. Ill. Jan. 3, 2022) ("As explained above, by requiring that [Plaintiff] submit to scans disclosing his facial geometry, [Defendant] has taken the requisite 'active step' in collecting, and thus also possessing, the data."). In addition, Plaintiff specifically alleges that McDonald's collected his voiceprint in Lombard, Illinois in early 2020 when Plaintiff provided his order to the AI voice assistant, the voice assistant understood and processed his order, and the voice assistant provided verbal confirmation of the order. Compl. ¶¶ 23-26. It is plausible, based on the Patent and other factual allegations, that Defendant actively collected or otherwise obtained Plaintiff's voiceprint. 740 ILCS 14/15(b).

[9]The Court agrees with Defendant, however, that Plaintiff's Section 15(d) claim fails for the "independent reason" that Plaintiff offers "no basis for the allegation that [the defendant] disclosed his biometric data." Id. at 969. Section 15(d) generally prohibits private entities from disclosing, redisclosing, or otherwise disseminating BIPA information without consent. 740 ILCS 14/15(d). In Heard, the plaintiff relied solely on "information and belief" of disclosure, which was insufficient:

Heard has not satisfied the court that BD alone has possession of the facts necessary to Heard's Section 15(d) claim. If Heard has a legitimate reason to suspect that BD disclosed his biometric data or that of the putative class members, he surely possesses information of some kind that triggered his suspicion—such as reports that BD has unlawfully disseminated biometric data in the past, or indications that Heard or the putative class members experienced identify theft after they used their employers' Pyxis

Carpenter v. McDonald's Corporation, --- F.Supp.3d ---- (2022)

systems.
440 F. Supp. 3d at 969. Here, all of Plaintiff's allegations regarding disclosure, redisclosure, or dissemination are conclusions that parrot BIPA's language. Dkt. 1-1 at 7 ("biometric information is used"); id. at 10 (Plaintiff "never provided written consent permitting Defendant to capture, store, or disseminate his voiceprint biometrics."); id. at 14 ("Defendant failed to obtain informed consent to disclose or disseminate[.]"). Without more factual support, this claim must fail. Namuwonge v. Kronos, Inc., 418 F. Supp. 3d 279, 285 (N.D. Ill. 2019) (dismissing Section 15(d) claim when plaintiff "pleaded on information and belief that [the defendant] ... disclosed her fingerprints to other third parties that host the data").

**IV. Conclusion**

Taking Plaintiff's factual allegations as true, the Court concludes that Plaintiff's Section 15(b) claim should proceed to discovery. Plaintiff has pleaded sufficient facts to put Defendant on notice of the Section 15(b) claim against it. The same cannot be said of the Section 15(d) claim, so that claim fails and is dismissed without prejudice.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2022 WL 897149

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3172967
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Leroy JACOBS, individually, and on
behalf of all others similarly situated,
Plaintiff,
v.

HANWHA TECHWIN AMERICA, INC.,
Defendant.

No. 21 C 866
|
Signed 07/27/2021

### Attorneys and Law Firms

Ryan F. Stephan, Haley Renee Jenkins, James B. Zouras, Stephan, Zouras, LLP, Chicago, IL, for Plaintiff.

Edward L. Bishop, Nicholas S. Lee, Stephanie Nicole White, Bishop Diehl & Lee, Ltd., Schaumburg, IL, Carlos M. Lazatin, Pro Hac Vice, O'Melveny & Myers LLP, Los Angeles, CA, Mark Howard Boyle, Michael Harris Adler, Donohue, Brown, Mathewson & Smyth, Chicago, IL, Randall Edwards, Pro Hac Vice, O'Melveny & Myers, San Francisco, CA, for Defendant.

### MEMORANDUM OPINION & ORDER

Robert W. Gettleman, United States District Judge

**\*1** Plaintiff Leroy Jacobs brings a three-count putative class action complaint against defendant Hanwhan Techwin America, Inc. ("Hanwha"), alleging violation of the Illinois Biometric Information Privacy Act, 740 ILCS §§ 14/1 et seq., ("BIPA"). Count I alleges a violation of Section 15(a), Count II alleges a violation of Section 15(b), and Count III alleges a violation of Section 15(d). Defendant has moved to dismiss all three counts (Doc. 21). For the reasons stated below, defendant's motion is granted.

### BACKGROUND

Defendant markets and sells video technology products, including security cameras manufactured by its parent company, Hanwha Techwin. Plaintiff alleges that, in December 2020, he saw several of defendant's security cameras installed at the entrance of a T.J. Maxx store in downtown Chicago. Plaintiff claims that he learned about the cameras' "ability to perform facial recognition" during that shopping trip. According to plaintiff, defendant collected his biometric data though facial recognition technology in the security cameras "to track, identify, and prosecute shoplifters." Plaintiff faults defendant for failing to inform its "visitors" that it is collecting and storing biometric data, and alleges "upon information and belief" that defendant discloses such data, all in violation of BIPA. Plaintiff seeks certification of the following class: "All individuals in the State of Illinois who had their facial geometry scans, biometric identifiers, and/or biometric information collected, captured, received, or otherwise obtained, maintained, stored, disclosed, or disseminated by defendant during the applicable statutory period."

Enacted in 2008, BIPA protects Illinois residents' privacy interest in their biometric information. BIPA "imposes numerous restrictions on how private entities collect, retain, disclose and destroy biometric identifiers," such as fingerprints, retina scans, and face scans. Heard v. Becton, Dickinson & Co., 440 F.Supp.3d 960, 963 (N.D. Ill. 2020) (citing Rosenbach v. Six Flags Entm't Corp., 129 N.E.3d 1197, 1199 (2019)). "Under the Act, any person 'aggrieved' by a violation of its provisions 'shall have a right of action against an offending party' and 'may recover for each violation.' " Id. (quoting 740 ILCS 14/20). Plaintiff asserts claims against defendant under Sections 15(a), 15(b), and 15(d) of BIPA. Section 15(a) requires entities "in possession of" biometric data to develop a publicly available retention schedule and destruction deadline for the data. 740 ICLS 14/15(a). Section 15(b) requires entities that collect biometric data first to inform the subject in writing that they are doing so; state the "specific purpose and length of time for which" the data "is being collected, stored, and used;" and receive an executed written release authorizing them to collect the data. 740 ILCS 14/15(b). Finally, Section 15(d) prohibits entities "in possession of" biometric data from disclosing it, except in certain circumstances. 740 ILCS 14/15(d).

**\*2** Defendant's response notes several crucial facts that plaintiff does not allege. For example, plaintiff does not allege that defendant installed the cameras, operated the cameras, or in any way accesses or controls T.J. Maxx's security system. Indeed, defendant notes that it has no interest in "prosecuting shoplifters" at T.J. Maxx. Plaintiff also does not allege that defendant operates any systems

or servers to store any information captured by the cameras. A full reading of plaintiff's complaint suggests that defendant's only alleged connection to those cameras was its role as the manufacturer and distributor.

## DISCUSSION

Defendant has moved to dismiss all three counts under Fed. R. Civ. P. 12(b)(6). To survive such a motion, a complaint must contain "enough factual matter (taken as true)" to suggest that a plaintiff is entitled to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). The complaint must include "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

### I. Section 15(b) of BIPA

Unlike Sections 15(a), (c), (d), and (e) of BIPA—all of which apply to entities "in possession of" biometric data—Section 15(b) applies to entities that "collect, capture, purchase, receive through trade, or otherwise obtain" biometric data. 740 ILCS 14/15(a)-(e). The parties appear to agree that mere possession of biometric data is insufficient to trigger Section 15(b)'s requirements. See Heard, 440 F.Supp.3d at 965 (the argument that Section 15(b) requires more than mere possession "finds ample support in the case law"); Namuwonge v. Kronos, Inc., 418 F.Supp.3d 279, 286 (N.D. Ill. 2019) (because "[t]he Illinois legislature used the term possession in certain sections of BIPA ... but chose not to include possession in section 15(b)," there "is a difference between possessing and collecting biometric information"); Bernal v. ADP, LLC, 2019 WL 5028609, at *1 (Cir. Ct. of Cook Cnty. Aug. 23, 2019) (crediting the argument that "the legislature intended for possession alone not to be enough to make an entity subject to § 15(b)").

The parties dispute, however, whether Section 15(b) applies only to entities that "actively" collect biometric data. Defendant argues that it does, and that plaintiff's allegations do not sufficiently plead that defendant itself actively collected his biometric data, or that of the putative class members. Plaintiff responds that defendant is reading a nonexistent and more stringent requirement

into the statute. Pointing to the "otherwise obtain" language in Section 15(b), plaintiff argues that the provision applies to any private entity that obtains biometric data, no matter the source or manner of collection. Plaintiff also emphasizes that the bankruptcy of a company called Pay By Touch—which allegedly provided major retailers with fingerprint scanners for customer transactions—motivated the Illinois legislature to pass BIPA. Plaintiff contends that because it was Pay By Touch's clients that actively collected individuals' fingerprints, active collection cannot be the touchstone of liability under Section 15(b).

Plaintiffs arguments are flawed. First, plaintiff agrees that Section 15(b) requires something more than mere possession, but is unable to articulate what that "something more" is, if not an affirmative act of collection. Plaintiff does not explain how an entity could "otherwise obtain" biometric information without taking any active steps to do so. Second, "the fact that the Pay By Touch bankruptcy may have influenced the Illinois legislature's decision to enact the BIPA does not mean that the legislature drafted every provision with Pay By Touch in mind, or that it intended for every provision to cover entities that operate exactly as Pay By Touch did." Heard, 440 F.Supp.3d at 966. Following other courts in this district, this court concludes that for Section 15(b)'s requirements to apply, an entity must, at a minimum, take an active step to collect, capture, purchase, or otherwise obtain biometric data. See, for example, id.

**\*3** Plaintiff has not sufficiently pleaded that defendant took any active steps to collect biometric data. For example, plaintiff repeatedly alleges that defendant "collected" his biometric data without alleging how, when, or any other factual detail. These allegations "merely parrot" BIPA's statutory language; they do not provide any "specific facts to ground [plaintiff's] legal claims." Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009). Other allegations in plaintiff's complaint appear to come from pleadings for other cases: for instance, the complaint refers generally to defendant's failure to inform "its visitors" or its "users" of its data collection practices, even though defendant is never alleged to have any "visitors," and the "user" or "customer" of the technology is T.J. Maxx—not plaintiff.[1] Plaintiff's brief makes some passing reference to a server, but there are no allegations in the complaint regarding defendant allegedly storing any biometric data on a server.

[1]     This problem appears throughout plaintiff's response brief as well, which apparently plagiarizes the pleadings in Heard. For example, plaintiff's brief refers to defendant Hanwha as "BD" or Becton Dickinson & Co., the defendant in Heard; refers to plaintiff

alternatively as "his" and "her"; the biometric data in question is listed as "fingerprints," even though Hanwha is not alleged to have collected anyone's fingerprints; and discusses "disclosure of employee biometrics" even though defendant's employees are not at issue.

Ultimately, plaintiff has not plausibly alleged that defendant collected, captured, purchased, received through trade, or otherwise obtained biometric data from plaintiff or the putative class members. In fact, a complete reading of the complaint makes clear that defendant is merely a third-party technology provider (that is, merely provided the cameras), and that the active collector and processor of the data is T.J. Maxx. This holding comports with other courts that have addressed Section 15(b) claims levied against third-party technology providers. See Heard, 440 F.Supp.3d at 967 (dismissing a Section 15(b) claim against a third-party provider of fingerprint equipment used by plaintiff's employer, because plaintiff failed to allege that the third-party provider actively collected the biometric data); Namuonge, 418 F.Supp.3d at 286 (dismissing Section 15(b) claim because the plaintiff did not plausibly allege that the defendant scanner manufacturer itself "collected, captured, or otherwise obtained [plaintiff's] biometric information," and it was clear from the complaint that the employer collected the data using a system provided by the technology-provider defendant); Bernal, 2019 WL 5028609, at *2 (dismissing Section 15(b) claim against provider of biometric scanning technology because the plaintiff "failed to allege facts sufficient ... for the court to properly assess defendant's actual involvement, relative to the biometric scanning technology, beyond the fact that defendant supplied [plaintiff's employer] with the technology").[2]

[2]  Plaintiff identifies two cases in which the court declined to dismiss a Section 15(b) claim against a third-party technology provider: Figueroa v. Kronos, 454 F.Supp.3d 772 (N.D. Ill. 2020), and Neals v. PAR Tech Corp., 419 F.Supp.3d 1088, 1092 (N.D. Ill. 2019). Yet in both cases, the Section 15(b) claims survived because, unlike the instant case, the factual allegations made clear that the manufacturers of the fingerprint scanners had themselves collected, obtained, or stored the biometric data.

For these reasons, Count II is dismissed.

## II. Sections 15(a) and 15(d)

Sections 15(a) and 15(d) of BIPA apply to entities "in possession of" biometric data. 740 ILCS 14/15(a), (d). BIPA does not define "possession," see 740 ILCS 14/40, and courts have routinely used the ordinary definition of the word. See Heard, 440 F.Supp.3d at 968; Rosenbach, 129 N.E.3d at 1205); Namuwonge, 418 F.Supp.3d at 284. In this context, possession occurs when someone "exercis[es] any form of control over the data or ... held the data at [his] disposal." Heard, 440 F.Supp.3d at 968. Like the plaintiff in Heard, plaintiff here does not provide any factual allegations that plausibly establish that defendant exercised control over plaintiff's data or otherwise held plaintiff's data at its disposal. And like the allegations concerning collection of data, most of plaintiff's allegations concerning possession merely parrot the statutory language. The complaint does not say whether defendant could freely access the data, or even how defendant allegedly received it. Cf. Namuwonge, 418 F.Supp.3d at 284 (the plaintiff's "allegation that Brookdale [plaintiff's employer] disclosed their employees' fingerprint data to Kronos [third-party technology provider] sufficiently alleges that Kronos possess the fingerprint data collected by Brookdale"). Plaintiff's complaint fails to plead factual matter that allows the court to draw the reasonable inference that defendant was "in possession" of his biometric data, or that of putative class members. See Heard, 440 F.Supp.3d at 968.

*4  The court also dismisses plaintiff's claim under Section 15(d) for an independent reason: plaintiff offers no basis for its allegation that defendant disclosed his biometric data, or that of the putative class members. See 740 ILCS 14/15(d) (providing that entities "in possession of" biometric data cannot disclose it except in limited circumstances). Plaintiff concedes that he relies on "information and belief," but argues that he is permitted to do so because the facts are within defendant's exclusive control. While plaintiffs are generally permitted to rely on information and belief in a complaint, the court is not convinced that it is appropriate to do so here. Plaintiff has not presented any legitimate reason to suspect that defendant disclosed his biometric data or that of the putative class members. See Heard, 440 F.Supp.3d at 969 ("If [plaintiff] has a legitimate reason to suspect that [defendant] disclosed his biometric data or that of the putative class members, he surely possesses information of some kind that triggered his suspicion—such as reports that [defendant] has unlawfully disseminated biometric data in the past, or indications that [plaintiff] or the putative class members experienced identity theft after they used [the technology system].").

**Jacobs v. Hanwha Techwin America, Inc., Slip Copy (2021)**

Plaintiff's complaint contains no allegations of fact which, if true, suggest there is any basis to even suspect that defendant disseminated the biometric data at issue. "The court is not required to credit rank speculation." Id. (citing Taha v. Int'l Bd. of Teamsters, Local 781, 947 F.3d 464, 469 (7th Cir. 2020)). Consequently, the court grants defendant's motion to dismiss Count I and Count III.

**CONCLUSION**

For the reasons stated above, the court grants defendant's motion to dismiss (Doc. 21).

**All Citations**

Slip Copy, 2021 WL 3172967

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4502089
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Christine MCGOVERAN, Joseph
Valentine, and Amelia Rodriguez, on
behalf of themselves and all other
persons similarly situated, known and
unknown, Plaintiffs,
v.
AMAZON WEB SERVICES, INC. and
Pindrop Security, Inc., Defendants.

C.A. No. 20-1399-LPS
|
Signed 09/30/2021

**Attorneys and Law Firms**

Stephen B. Brauerman and Ronald P. Golden III,
BAYARD, P.A., Wilmington, DE, Andrew D. Schlichter,
Joel Rohlf, and Alexander L. Braitberg, SCHLICHTER
BOGARD & DENTON, LLP, St. Louis, MO, Attorneys
for Plaintiffs

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP,
Wilmington, DE, Beth Harrington, MORGAN, LEWIS &
BOCKIUS LLP, Chicago, IL, Raechel Keay Kummer,
MORGAN, LEWIS & BOCKIUS LLP, Washington, DC,
Attorneys for Defendant Amazon Web Services, Inc.

Jack B. Blumenfeld, MORRIS, NICHOLS, ARSHT &
TUNNELL LLP, Wilmington, DE, Andrew B. Bloomer,
Catherine L. Fitzpatrick, and Amelia Bailey, KIRKLAND
& ELLIS LLP, Chicago, IL, Diana M. Torres,
KIRKLAND & ELLIS LLP, Los Angeles, CA, Attorneys
for Defendant Pindrop Security, Inc.

## MEMORANDUM OPINION

STARK, U.S. District Judge:

**\*1** Plaintiffs Christine McGoveran, Joseph Valentine, and
Amelia Rodriguez (collectively, "Plaintiffs") brought this
class action lawsuit against Defendants Amazon Web
Services, Inc. ("AWS") and Pindrop Security, Inc.
("Pindrop," and together with AWS, "Defendants") for
alleged violations of an Illinois statute, the Biometric
Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat.
14/1 et seq. (See generally D.I. 1) ("Compl.") Defendants
move to dismiss the complaint. (D.I. 12, 15) They argue
that Plaintiffs' claims fail because the complaint alleges
an improperly extraterritorial application of BIPA.
Defendants also contend that the complaint should be
dismissed because BIPA contains an exemption for
financial institutions and because the complaint fails to
state plausible claims upon which relief can be granted.
For the reasons explained below, the Court will grant
Defendants' motions based on extraterritoriality.

## BACKGROUND

### A. Biometric Information Privacy Act

In 2008, the Illinois legislature passed the Biometric
Information Privacy Act because "[t]he use of biometrics
is growing in the business and security sectors," including
in Illinois. See 740 Ill. Comp. Stat. 14/5(a)-(b). BIPA
contains several definitions that are relevant for this case.
BIPA defines a "biometric identifier" as "a retina or iris
scan, fingerprint, voiceprint, or scan of hand or face
geometry." 740 Ill. Comp. Stat. 14/10. It defines
"biometric information" more broadly as "any
information, regardless of how it is captured, converted,
stored, or shared" that is "based on an individual's
biometric identifier." Id. BIPA protects biometric
information because biometric identifiers are
"biologically unique to the individual" and cannot be
changed, so disclosure leaves compromised individuals at
an increased risk for identity theft. 740 Ill. Comp, Stat. §
14/5(c).

In this case, the relevant biometric identifiers are
voiceprints. (Compl. ¶ 24) "A 'voiceprint' is more
accurately called a voice spectrograph (or spectrogram),"
and it is "a representation of an utterance of speech."
Thomas L. Bohan, Scientific Evidence and Forensic
Science Since Daubert, 56 Me. L. Rev. 101, 134 (2004).
Voiceprints may be used, for instance, to confirm the
identities of individuals who call customer service lines.
(Compl. ¶ 40)

**B. Parties**

Plaintiffs Christine McGoveran, Joseph Valentine, and Amelia Rodriguez are all residents of Illinois. (*Id.* ¶¶ 6-8) Defendants Pindrop and AWS are both Delaware corporations that are registered to do business in Illinois. (*See id.* ¶¶ 10, 12) Pindrop has its principal place of business in Atlanta, Georgia. (*See* D.I. 16 at 6 n.3) It offers voiceprint services, including its "Deep Voice" and "Phoneprinting" products, which are "used by call centers and customer service personnel to confirm the identity of individual callers." (Compl. ¶¶ 52-57) AWS offers cloud storage services, with data centers in Virginia, Ohio, California, and Oregon. (*Id.* ¶ 59; *see also* D.I. 16 at 6) It also offers cloud-based call center services under the brand name "Amazon Connect." (Compl. ¶¶ 60-61) Defendants have advertised that Pindrop's voiceprinting technology can be integrated with Amazon Connect so that Amazon Connect customers may confirm callers' identities. (*Id.* ¶¶ 64-68) One such Amazon Connect customer is nonparty John Hancock, a financial services company based in Massachusetts. (D.I. 16 at 3)

**C. Factual Allegations**

**\*2** Plaintiffs allege that Defendants have violated BIPA "by collecting, possessing, redisclosing, profiting from, and failing to safeguard their biometric identifiers and biometric information," including their voiceprints. (Compl. ¶ 1)

Specifically, Plaintiffs allege that they "called John Hancock customer service representatives and/or call center(s) on numerous occasions, from Illinois, using Illinois telephone numbers." (*Id.* ¶ 93; *see also id.* ¶¶ 94-96) According to Plaintiffs, "John Hancock's call center(s) use Amazon Connect with Pindrop biometric voiceprint authentication" (*id.* ¶ 97), and those call centers use Pindrop's voiceprinting technology on every John Hancock caller (*id.* ¶ 100). As Plaintiffs understand the technology, "audio from incoming calls to call centers ... is sent to Pindrop" (*id.* ¶ 75), and the "analysis of intercepted phone calls to extract biometric data takes place in part on Pindrop's servers" (*id.* ¶ 78). Once that analysis is done, "the output ... is returned to AWS's servers" (*id.* ¶ 75), resulting in the storage of biometric information on AWS's servers (*id.* ¶¶ 79-80). In Plaintiffs' view, Defendants' actions violate BIPA's various provisions. (*Id.* ¶¶ 110-22)

To address this alleged misconduct, Plaintiffs seek to represent the following class of individuals: "[a]ll Illinois citizens who placed one or more phone calls to, or received one or more phone calls from, an entity using Amazon Connect and Pindrop's voice authentication and/or fraud detection technology, from December 17, 2014 until present." (*Id.* ¶ 123) Plaintiffs estimate that the class includes "thousands of people." (*Id.* ¶ 124)

**D. Procedural History**

Plaintiffs initially sued Defendants in Illinois state court, raising essentially the same allegations as in this case. *See generally McGoveran v. Amazon Web Servs., Inc.*, 488 F. Supp. 714, 716-17 (S.D. Ill. 2020). Defendants removed that case to federal court. *Id.* at 718. In September 2020, the Illinois district court dismissed the case for lack of personal jurisdiction over Defendants. *Id.* at 721-24. As the court explained, "[n]othing about" the alleged course of conduct "occurred in Illinois except for the initial dialing of the phone by Plaintiffs." *Id.* at 722.

A month later, Plaintiffs filed their complaint in this Court. (*See* Compl. at 1, 31) The complaint contains five counts for alleged violations of each section of BIPA:

> • Count I – Violation of Section 15(a): "entities that possess biometric data 'must develop a written policy, made available to the public' regarding the retention and destruction of the data"

> • Count II – Violation of Section 15(b): "entities may not 'collect' a person's biometric data unless they first provide notice and obtain informed written consent"

> • Count III – Violation of Section 15(c): "entities that possess biometric data may not 'sell, lease, trade, or otherwise profit from' it"

> • Count IV – Violation of Section 15(d): "entities may not disseminate biometric data without consent"

> • Count V – Violation of Section 15(e): "entities that possess biometric data must 'store, transmit, and protect' it from disclosure in a manner consistent with 'the reasonable standard of care within' an industry"

(D.I. 18 at 4)

Pindrop and AWS each moved to dismiss the complaint. (D.I. 12, 15) The Court received full briefing on the

McGoveran v. Amazon Web Services, Inc., Slip Copy (2021)

motions (*see generally* D.I. 13, 16, 18, 19, 21, 22) and also considered numerous notices of subsequent authority filed by the parties (*see generally* D.I. 23, 28, 29, 30).[1] The Court heard oral argument by teleconference on September 15, 2021. (*See* D.I. 31) ("Tr.")

[1]    The Court will deny Plaintiffs' motion for leave (D.I. 32) to file a response to Pindrop's notice of subsequent authority (D.I. 30) as moot. The Court has not cited nor relied on either of the cases Pindrop addressed in its notice.

**LEGAL STANDARDS**

**\*3** Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material factual allegations in the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Therefore, the Court may grant such a motion to dismiss "only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).' " *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).) A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Ultimately, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept "bald assertions" as true. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted). Nor is it obligated to credit "unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997). The Court may likewise reject allegations that are "self-evidently false." *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

**DISCUSSION**

**I. Extraterritoriality**
Under Illinois law, a "statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) (internal quotation marks omitted). BIPA does not contain an express provision stating it is intended to apply extraterritorially. *See, e.g., Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at \*5 (N.D. Ill. Sept. 15, 2017). Therefore, BIPA violations must occur in Illinois in order for plaintiffs to obtain any relief. *See, e.g., Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1100 (N.D. Ill. 2017) ("[The plaintiffs'] asserted violations of [BIPA] must have taken place in Illinois in order for them to win."). The applicable test is whether the relevant circumstances "occur[ed] primarily and substantially in Illinois." *Avery*, 835 N.E.2d at 854; *see also Rivera*, 238 F. Supp. 3d at 1101.[2]

[2]    Initially, Plaintiffs did not dispute the application of this "primarily and substantially" standard. (*See, e.g.,* D.I. 18 at 17; D.I. 19 at 16) Just before the hearing (which the Court scheduled despite not receiving any request for oral argument), Plaintiffs suggested for the first time that the Illinois legislature might have intended BIPA to have an extraterritorial effect. (D.I. 29 at 1-2) (citing *Am. Civ. Liberties Union v. Clearview AI, Inc.*, 2021 WL 4164452 (Ill. Cir. Ct. Aug. 27, 2021)) During the hearing, Plaintiffs articulated this argument more forcefully. (*See* Tr. at 34-35, 48) Although *Clearview* was just decided, there is no reason why Plaintiffs could not have made this statutory argument in their briefing. Consequently, the Court considers this argument forfeited. *See, e.g., Almirall, LLC v. Torrent Pharm., Ltd.*, 2021 WL 3021947, at \*6 (D, Del. July 13, 2021) (holding that plaintiff forfeited argument for purposes of Rule 12 motion by not raising it in briefing). Even if Plaintiffs had not forfeited the argument, they are wrong. *Clearview* said only that BIPA "come[s] close" to having an express provision regarding extraterritorial application, not that it actually has a provision. 2021 WL 4164452, at \*5.

**\*4** Defendants argue that Plaintiffs fail to allege conduct that occurred primarily and substantially in Illinois. (D.I. 13 at 6-8; D.I. 16 at 5-10) The Court agrees with Defendants. With respect to Pindrop, Plaintiffs principally allege that Pindrop "extracted biometric information from calls originating from Illinois, from Illinois citizens, and from clearly recognizable Illinois phone numbers." (D.I. 18 at 17) It is similar for AWS. Plaintiffs principally allege that AWS "intercepted biometric information" from Illinois callers. (D.I. 19 at 16) The location of the caller does not, however, say anything about the location where the rest of the conduct occurred.

As Defendants correctly point out, "Plaintiffs identify nothing to suggest their 'voiceprints' were created, possessed, or stored ... in Illinois." (D.I. 22 at 1; *see also* D.I. 16 at 9) Even if Plaintiffs' "voice audio was intercepted in Illinois" (D.I. 18 at 17; D.I. 19 at 17), as Plaintiffs cursorily allege (*see* Compl. ¶¶ 85, 110), voice audio is not the same as a voiceprint, and voice audio does not meet the definition of "biometric identifier" or "biometric information" under BIPA. *See* 740 Ill. Comp. Stat. 14/10. Moreover, AWS emphasizes that its data centers are located wholly outside Illinois – in Virginia, Ohio, California, and Oregon – and Plaintiffs do not allege otherwise. (D.I. 16 at 6, 9)[3] Pindrop is also located outside Illinois in Atlanta, Georgia – and, again, Plaintiffs do not allege otherwise. (*Id.*) Simply put, there is no indication in the complaint that Defendants did anything in Illinois.

[3]     Plaintiffs object to the Court's consideration of information on AWS's website related to the location of AWS's data centers. (*See* D.I. 19 at 17) The complaint cites the AWS website multiple times. (*E.g.*, Compl. at 12 nn.9 & 12; *id.* at 13 nn.13-14; *id.* at 14 n.17) On a motion to dismiss, the Court is permitted to "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). Under the circumstances presented here, the Court is, therefore, permitted to consider the AWS website. *See Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 501 (D.N.J. 2006) ("[T]hese documents have been expressly relied upon by Plaintiff, thus there is no issue regarding notice to the Plaintiff, and this Court may properly consider them in deciding the instant motion to dismiss.").

Plaintiffs allege that both Defendants failed to make written biometric data retention and destruction policies available to the public and that they failed to provide notice to and obtain consent from Illinois citizens. (D.I. 18 at 17; D.I. 19 at 17) According to Plaintiffs, those failures "necessarily occurred in Illinois." (D.I. 18 at 17;

D.I. 19 at 17) The Court does not see why that must be true. (*See* Tr. at 10) ("[I]t really makes no sense to assign a location for an act that did not occur.") More fundamentally, that argument depends on the assumption that Defendants were required to provide notice, publish policies, and obtain consent in Illinois. As stated above, however, Plaintiffs have not alleged any activity in Illinois that would impose such obligations on Defendants.

At bottom, Plaintiffs' concrete allegations about this case's connections to Illinois are nothing more than repeated statements (phrased three different ways) about Plaintiffs' residency: Plaintiffs' phone calls to John Hancock "originat[ed] from Illinois" because Plaintiffs live there; the calls were "from Illinois citizens" because Plaintiffs live there; and the calls were placed from "clearly recognizable Illinois phone numbers" because, once again, Plaintiffs live there. (*See* D.I. 18 at 17; D.I. 19 at 16) A plaintiff's residency is not enough to establish an Illinois connection in order to survive a motion to dismiss based on extraterritoriality. *See, e.g.*, *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 755 (N.D. Ill. 2008) (dismissing claim even though "plaintiffs contend that Illinois has 'significant contacts' with each of the named class plaintiffs because each is a resident"); *Super Pawn Jewelry & Loan, LLC v. Am. Env't Energy, Inc.*, 2013 WL 1337303, at \*7 (N.D. Ill. Mar. 29, 2013) (dismissing claim given "weak connection to Illinois" despite plaintiff's residency). Here, Plaintiffs' residency, standing alone, is not sufficient to establish that the alleged conduct occurred "primarily and substantially" in Illinois.

**\*5** The Illinois district court's dismissal of the related action for lack of personal jurisdiction underscores the weak connection between Plaintiffs' allegations and Illinois:

> In this case, Plaintiffs were the ones who made the call – to John Hancock – from their Illinois phone numbers. AWS then intercepted the calls once they were connected to an Amazon Connect call center and sent the audio to Pindrop for processing. The output from that processing was then returned to AWS's servers. ***Nothing about this process occurred in Illinois except for the initial dialing of the phone by Plaintiffs.***

> Moreover, there is no indication that either of these companies purposefully directed their activities at Illinois citizens or that this litigation arises from contacts they created with Illinois. Rather, the litigation arises because John Hancock, a third party based in Massachusetts, contracted with AWS and Pindrop to analyze the voices of its customers.

*McGoveran*, 488 F. Supp. 3d at 722 (internal citation

omitted; emphasis added). The Court need not decide the precise relationship between the personal jurisdiction and extraterritoriality inquiries. Regardless of which inquiry imposes a higher burden, the Illinois district court's jurisdictional findings and thoughtful analysis wholly support this Court's ruling.[4]

[4] During the hearing, Plaintiffs suggested that the Illinois court did not make a factual finding when it stated that "nothing ... occurred in Illinois except for the initial dialing of the phone by Plaintiffs." (*See* Tr. 40, 45-47) No matter how that statement is characterized, the Court views it as highly persuasive because: (i) it is unequivocal, and (ii) another district judge made it after considering many of the same factors that are relevant to the extraterritoriality analysis. Although Plaintiffs maintain that the Illinois court was wrong, Plaintiffs never appealed the dismissal of the related action. (*Id.* at 47)

The Court also notes that Plaintiffs already had an opportunity to explore Defendants' possible connections to Illinois in responding to Defendants' motion to dismiss the related action. The instant case is effectively Plaintiffs' second bite at the apple. Yet, in refiling essentially the same complaint in this Court, Plaintiffs have not added any notable allegations establishing a stronger connection to Illinois. (*See* Tr. at 8) (noting addition of only two paragraphs upon refiling here)

The Court recognizes that other district courts have been hesitant to grant motions to dismiss BIPA claims based on extraterritoriality. *See, e.g.*, *Rivera*, 238 F. Supp. 3d at 1101-02 ("Discovery is needed to determine whether there are legitimate extraterritoriality concerns."); *Monroy*, 2017 WL 4099846, at *6 ("[The defendant] may raise the argument at a later time, if and when the record affords a clearer picture of the circumstances relating to [the plaintiff]'s claim."). Still, Illinois courts have dismissed other types of claims at this stage, based on extraterritoriality, when plaintiffs have failed to allege a "sufficient nexus" to Illinois. *E.g.*, *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 732-34 (N.D. Ill. 2018); *see also* D.I. 21 at 3 & n.1 (collecting cases). Even if dismissing BIPA claims is "generally inappropriate," *see* *Vance v. Int'l Bus. Machs. Corp.*, 2020 WL 5530134, at *3 (N.D. Ill. Sept. 15, 2020), that suggests there may be exceptions, and this case is one of them. (*See* Tr. at 51) Plaintiffs do not allege any direct interaction with AWS or Pindrop that might plausibly be imputed to Illinois; they allege only interactions with John Hancock in Massachusetts, who in turn interacted with Defendants. (*See* D.I. 21 at 3-4)

**\*6** Take, for example, *Rivera*. In that case, the plaintiffs alleged that photos of them were taken in Illinois using

Google Droid devices, that the photos were automatically uploaded to the Google Photos application from Illinois, and that Google performed scans of their faces. *See Rivera*, 238 F. Supp. 3d at 1090-91. Those allegations established a direct interaction between the plaintiffs and the defendants, and the allegations suggested that a good amount of the relevant conduct could be attributable to Illinois. Here, by contrast, Plaintiffs never interacted directly with Pindrop or AWS from Illinois, and the Defendants' conduct cannot be fairly attributed to Illinois. Indeed, Plaintiffs have not meaningfully alleged that anything happened in Illinois other than Plaintiffs dialing their phones. *See McGoveran*, 488 F. Supp. 3d at 722.

Plaintiffs fare no better under *Monroy*. In that case, the plaintiffs sued Shutterfly for its similar use of facial recognition technology on photos of them uploaded to Shutterfly by other Illinois residents. *See Monroy*, 2017 WL 4099846, at *1. Put differently, that case, like *Rivera*, involved a course of conduct in which the defendant was intentionally interacting with individuals in Illinois. The same is not true in this case. *See McGoveran*, 488 F. Supp. 3d at 722. While John Hancock's activities with respect to Plaintiffs might be ascribed to Illinois, the same cannot be said for Pindrop and AWS, who were merely third-party contractors performing work for John Hancock.

Finally, the Court notes that Plaintiffs have asked for the adoption of a rule that is overly broad and ultimately untenable. According to Plaintiffs, "under BIPA, as long as the source of the biometric data is Illinois, that's enough to establish liability." (Tr. at 44-45) That rule flies in the face of Illinois cases holding that a plaintiff's residency is not enough to survive a motion to dismiss based on extraterritoriality. *See, e.g.*, *Vulcan Golf*, 552 F. Supp. 2d at 755. Furthermore, if that rule were correct, then BIPA could impose liability on a vast number of corporations who do no business in Illinois and who lack any other significant connection to Illinois. There is no basis in the statutory language to find that BIPA stretches so far.

In sum, the complaint is devoid of any allegations involving conduct that occurred "primarily and substantially" in Illinois. BIPA does not apply extraterritorially, but the complaint alleges an extraterritorial application of BIPA. Accordingly, the Court will grant Defendants' motions to dismiss.[5]

[5] Because the Court will grant both motions based on extraterritoriality, it need not (and does not) reach any other issues presented.

McGoveran v. Amazon Web Services, Inc., Slip Copy (2021)

**II. Amendment**

Plaintiffs asked during the hearing for an opportunity to amend their complaint to add more specific allegations regarding connections between this case and Illinois. (*See* Tr. at 68) At this point, the Court cannot say that any such amendment would necessarily be futile. Accordingly, the Court will permit Plaintiffs to file a motion for leave to amend their complaint (following the Court's procedures with respect to letter briefing for motions to amend) no later than October 29, 2021.

**CONCLUSION**

For the foregoing reasons, Pindrop's and AWS's motions to dismiss (D.I. 12, 15) will be granted. An appropriate order follows.

**All Citations**

Slip Copy, 2021 WL 4502089

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 787955
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Richard ROGERS, individually and on
behalf of similarly situated individuals,
Plaintiff,
v.
BNSF RAILWAY COMPANY, Defendant.

Case No. 19 C 3083
|
Signed 03/15/2022

**Attorneys and Law Firms**

David Louis Gerbie, Brendan James Duffner, McGuire
Law, P.C., Chicago, IL, for Plaintiff Richard Rogers.

Elizabeth Brooke Herrington, Alex David Berger,
Morgan, Lewis & Bockius LLP, Tyler Zachary Zmick,
Seyfarth Shaw LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

**\*1** Richard Rogers has sued BNSF Railway Company on
behalf of a putative class for violations of the Illinois
Biometric Information Privacy Act (BIPA). Rogers
alleges that he is a truck driver who visits BNSF railyards.
At some BNSF facilities, he is required to scan a
biometric identifier into identity verification devices to
gain entrance. According to Rogers, BNSF collects and
stores this information without receiving driver consent
and without informing drivers of its data retention
policies, both of which are required under BIPA.

BNSF has moved for summary judgment on Rogers's
claims. The Court denies BNSF's motion for the reasons
stated below.

**Background**

**A. BIPA**
BIPA requires a private entity that possesses biometric
identifiers or information to develop and make available
to the public a written policy establishing a retention
schedule and guidelines for permanently destroying the
information when the initial purpose for collecting it has
been satisfied or within three years of a person's last
interaction with the entity, whichever is sooner. 740 ILCS
14/15(a). In addition, BIPA prohibits a private entity from
collecting or obtaining a person's biometric identifier or
information unless it first informs the person or her
legally authorized representative in writing that the
information is being collected or stored, as well as the
purpose and length of term of the collection, storage, and
use, and receives a written release executed by the person
or her legally authorized representative. Id. § 15(b)(1)-(3).
BIPA provides a right of action to a person aggrieved by a
violation of the statute and permits a prevailing party to
recover actual damages or liquidated damages of $1,000
for a negligent violation or $5,000 for an intentional or
reckless violation. Id. § 20.

**B. BNSF facility access**
The following facts are undisputed except where
otherwise noted. BNSF is one of the largest freight
railroad networks and railroad operators in North
America. Among other cargo, it transports what the
Department of Homeland Security (DHS) has deemed
hazardous material, such as crude oil. Consequently,
BNSF must comply with various federal laws and
regulations for railyard security purposes.

BNSF operates four intermodal facilities in Illinois, where
trailers and containers are loaded from trucks to trains and
vice versa. These facilities use an Auto-Gate System
(AGS) to control the entry and exit of truck drivers. The
AGS has the driver pull through a portal where the
vehicle is identified and photographed. The driver then
proceeds to a kiosk. If the driver is not registered in the
AGS, the kiosk directs the driver to proceed to a driver's
assistance building in a holding area, where a clerk
registers the driver into the AGS. This registration
includes recording the driver's information and scanning

the driver's fingerprints, but it does not include obtaining written consent from the driver or informing the driver of the length of term for which the data will be stored. The driver can then proceed into the rest of the facility. On subsequent visits, a driver who is registered can enter an identifying number into the kiosk and place a finger on the kiosk scanner to gain entry to the facility.

**\*2** BNSF contracted with a third-party company called Remprex to install and manage an AGS at each of its Illinois facilities. This contractual relationship is governed by a master agreement, but the parties dispute to what extent BNSF is involved in the operation of the AGS and which company ultimately owns the AGS. BNSF contends that Remprex is the sole operator and owner; Rogers contends that BNSF owns the AGS and, in effect, controls Remprex as the operator. The parties, however, agree that "Remprex provides 24/7 'intelligent gate operation' services at BNSF's intermodal facilities." Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 5 (dkt. no. 128-2).

Rogers worked as a truck driver for a third-party logistics company and routinely drove to BNSF facilities in Illinois to drop off freight. He first visited one of these facilities in 2003 and visited one as recently as November 2020. His AGS registration information, which includes his fingerprint scan, first appears in the database on December 5, 2012.

### C. Procedural history
Rogers sued BNSF in the Circuit Court of Cook County on April 4, 2019. BNSF removed the case to this Court one month later, on May 7. On October 31, 2019, the Court denied BNSF's motion to dismiss. The Court held that based on the complaint, federal law did not preempt Rogers's claims and his claims were sufficiently pled. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180 (N.D. Ill. Oct. 31, 2019).

On August 25, 2021, the Court granted Rogers's motion to sever and remand his BIPA section 15(a) claim to the Circuit Court of Cook County. On September 10, 2021, Rogers filed a second amended complaint in which he narrowed his lawsuit by removing his BIPA section 15(a) and 15(d) claims, leaving the section 15(b) claim, which is still at issue.

BNSF has now moved for summary judgment on Rogers's remaining BIPA claim.

### Discussion

### A. Summary judgment
To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

Along with its arguments on the merits of the BIPA claim, BNSF argues that three federal statutes preempt Rogers's BIPA claim: the Federal Railroad Safety Act (FRSA), the Interstate Commerce Commission Termination Act (ICCTA), and the Federal Aviation Administration Authorization Act (FAAAA). The Court will address the preemption arguments first.

"Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663–64 (1993). "Preemption can occur in three different ways: express, conflict, and field." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019). "Express preemption applies when Congress clearly declares its intention to preempt state law." *Id.* "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 507 U.S. at 664; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). Conflict preemption applies "when state law stands as an obstacle to fully accomplishing the objectives of Congress." *Nelson*, 928 F.3d at 646–47. But "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

## 1. FRSA

### a. Express preemption

**\*3** Congress enacted FRSA "to promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To this end, FRSA provides that laws and regulations "related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1). It permits states to adopt laws, regulations, and standards "related to railroad safety or security" until the Secretary of Transportation or the Secretary of Homeland Security "prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). Accordingly, the Supreme Court has framed FRSA's preemption inquiry as whether federal regulation "substantially subsume[s] the subject matter of the relevant state law"; it is not enough that the federal regulations " 'touch upon' or 'relate to' that subject matter." *Easterwood*, 507 U.S. at 664.[1] Said differently, FRSA preemption turns on whether federal regulation substantially subsumes "the safety concern that the state law addresses." *Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 892 (N.D. Ill. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999)) (emphasis removed).

[1]     BNSF argues that the proper preemption inquiry asks "whether federal regulations cover the specific allegations made by Plaintiff." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 9 (dkt. no. 107-1). This proposed formula leads to the same outcome. Although BNSF uses biometric information to control ingress and egress to their facilities, Rogers's allegations arise from the "right to make an *informed* decision" in providing his biometrics. 2nd Am. Compl. ¶ 9 (dkt. no. 103) (emphasis in original).

As for BIPA's subject matter, the statute, as the Court discussed in denying BNSF's motion to dismiss, "prescribes how [biometric information] is to be collected or stored." *Rogers*, 2019 WL 5635180, at \*4. The statute "imposes disclosure, consent, and recordkeeping requirements related not to transportation of persons or property but rather to certain types of information." *Id.* at \*2. The relevant concern of BIPA is biometric privacy: the law addresses the potential harms flowing from "compromised" biometric information given the "unique" and immutable nature of that information. 740 ILCS 14/5;

*see also Fleury*, 528 F. Supp. 3d at 892 ("BIPA's subject matter is *how* biometric information is collected and used.").

Thus the question for FRSA preemption purposes is whether federal regulation, either from the Secretary of Transportation or Secretary of Homeland Security, substantially subsumes BIPA's biometric privacy subject matter. BNSF argues that federal regulation concerning railway security and the transportation of hazardous materials does so. *See* 49 C.F.R. § 1580.205(i) (requiring rail hazardous material shippers to "use physical security measures to ensure that no unauthorized individual gains access to the rail secure area"); 49 C.F.R. § 172.800(b) (requiring entities that transport hazardous materials to "develop and adhere to a transportation security plan"). To fulfill some of these regulatory obligations, BNSF complies with a voluntary government-private sector program called C-TPAT (Customs-Trade Partnership Against Terrorism). *See generally* 78 Fed. Reg. 15889 (Mar. 13, 2013) (notice of proposed rulemaking for C-TPAT). Though not in the Federal Register, BNSF contends that C-TPAT's rail carrier provisions include maintaining "access controls" to "prevent unauthorized access into facilities," and "biometric identification" is one such access control that it can employ. *See* Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 12–13 (dkt. no. 107-1). Based on this, BNSF argues that C-TPAT, read together with the other federal regulations BNSF cites, trigger FRSA express preemption.

The Court disagrees and accordingly need not wade into the parties' dispute over whether C-TPAT can serve as a basis for preemption seeing as how it is a voluntary program. The regulations concerning railway security that BNSF points to all deal with "develop[ing] and implement[ing] a transportation security plan" for the purposes of safely transporting hazardous materials. *Id.* at 14 (citing 49 C.F.R. §§ 172.800(b), 172.802(a)(2)). In a similar vein, C-TPAT is a cooperative partnership between supply chain companies and DHS with the goal of enhancing security in exchange for facilitated processing of shipments. 78 Fed. Reg. at 15889; *see also Fleury*, 528 F. Supp. 3d at 892 ("[T]he C-TPAT security requirements ... merely mention the use of biometric identification systems."). BNSF has not cited any federal regulation or, for that matter, any provision of C-TPAT, that addresses how it must collect or store biometric information, which is what BIPA covers. The Court agrees with the analysis in *Fleury v. Union Pacific Railroad Co.*, in which this Court's colleague Judge Jorge Alonso was presented with and rejected the same claim of FRSA express preemption premised on C-TPAT and related railway security regulation: "[a]t most, these DHS

standards 'touch upon' or 'relate to' the collection of biometric information." *Id.* That, however, does not meet the "substantially subsume" requirement set forth in *Easterwood*. *See Easterwood*, 507 U.S. at 664.

**\*4** For these reasons, the Court concludes that FRSA express preemption does not apply.

### b. Conflict preemption

BNSF next argues that conflict preemption, which applies when the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," arises from FRSA and the previously discussed regulations. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).[2] BNSF contends that BIPA imposes a duty that conflicts with federal law in two ways.

[2]  BNSF disclaims the proposition that it is impossible to comply with both state law and federal regulation, which is an alternative basis for conflict preemption. Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 14 (dkt. no. 107-1).

First, BNSF asserts that BIPA "prohibits mandatory use of biometric access controls," meaning BNSF cannot "comply[ ] with agency guidelines and standards, including the C-TPAP requirements that involve mandatory biometric access control." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 15 (dkt. no. 107-1). BNSF has cited no evidence, however, indicating that C-TPAP requirements involve mandatory biometric access controls. Perhaps more to the point, BNSF admits that it has disabled the AGS biometric functions for various reasons, which suggests that biometric access controls in fact are not mandatory under the purported federal requirements. Def.'s Resp. to Pl.'s Stat. of Add. Material Facts ¶ 18 (dkt. no. 139-1). Put another way, BNSF does not support its use of biometrics as necessary for compliance with C-TPAP, when the record suggests that such use, if anything, is at most one way to comply.

Yet even if C-TPAP mandated biometric controls, BIPA does not proscribe their use. The state law simply requires consent and an appropriate data retention policy. If federal law permitted *unconsenting* biometric access controls or *indefinite retention* of biometric information, then BNSF conflict preemption might arise. But this is not the case. In short, Illinois law does not deprive BNSF of a federally prescribed option.

Second, BNSF argues that BIPA stands as an obstacle to Congress's intention of ensuring railway safety and security, especially for railways that transport hazardous materials. BNSF views compliance with BIPA as forcing railroads "to adopt a patchwork of access controls at Illinois facilities," which "frustrat[es] the express Congressional purpose of 'uniform' railway safety regulation." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 16 (dkt. no. 107-1) (quoting 49 U.S.C. § 20106(a)(1)). BNSF also contends that requiring truck driver consent deprives railroads "of the most effective means of securing their facilities." *Id.*

This argument also lacks merit. For one, BNSF cannot premise FRSA preemption on a "hypothetical or theoretical conflict." *Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 662 (7th Cir. 2010). FRSA provides that laws "related to railroad security shall be nationally uniform *to the extent practicable.*" 49 U.S.C. § 20106(a)(1) (emphasis added). And in the next paragraph, FRSA expressly contemplates a state "adopt[ing] or continu[ing] in force an additional or more stringent law ... related to railroad safety or security...." *Id.* § 20106(a)(2). The flexibility of this language suggests that any conflict with BIPA is, at most, hypothetical or theoretical.

**\*5** The evidence also does not support BNSF's contention that enforcement of BIPA will create a patchwork of access controls. BNSF admits that it has not uniformly implemented biometric access controls across its facilities nationwide, though federal regulatory provisions applying to shippers of hazardous material presumably apply across the country. Relatedly, Rogers points out that BNSF sometimes regulates entry through a RailPass smartphone app that does not implicate BIPA—a point that BNSF fails to even acknowledge, let alone address, in its reply brief.

The Court holds that BNSF's compliance with BIPA would not frustrate Congress's purpose in passing FRSA. Conflict preemption therefore does not apply.

### 2. ICCTA preemption

BNSF argues ICCTA preempts Rogers's BIPA claim because it "would have the effect of ... unreasonably interfering with railroad transportation." *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 895 (7th Cir. 2017).[3] In addressing BNSF's earlier motion to dismiss, the Court agreed with Rogers, based on the record as it then existed, in rejecting this as-applied preemption challenge because

Rogers v. BNSF Railway Company, Slip Copy (2022)

any impact of BIPA's requirements on rail transportation was "not just indirect but also highly speculative." *Rogers*, 2019 WL 5635180, at *3. Now, however, BNSF asserts that the record suggests otherwise.

3   Although BNSF is not entirely clear in its opening brief, the reply brief only spells out an argument for as-applied preemption, not categorical preemption. *See* Def. BNSF Ry. Co.'s Reply in Supp. of Mot. for Summ. J. at 13–14 (dkt. no. 139); *see generally Wedemeyer*, 850 F.3d at 894 (detailing the difference between categorical and as-applied ICCTA preemption). Thus, to the extent that BNSF presented any categorical preemption argument in its opening brief, the Court considers it forfeited.

BNSF explains that it collects biometrics for the purpose of facilitating its intermodal operations, but that alone does not demonstrate the "significant" impact necessary to establish unreasonable interference. *See Union Pac. R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 683 (7th Cir. 2011) (describing how preemption under this standard applies when the interference is "significant"). Accordingly, BNSF further asserts that compliance with BIPA would require changes to its AGS procedure in Illinois—such as maintaining notice-and-consent documentation and implementing a three-year record retention policy—that supposedly would be "significant considering BNSF's size and scope." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 19 (dkt. no. 107-1). BNSF also asserts that the use of biometric access controls is "integral" to its operations, implying that any change to how it employs these controls necessarily establishes unreasonable interference. *Id.*

The Court does not find this persuasive. Though BNSF is correct to note that it may be required to make procedural changes to comply with state law, this was already evident at the motion to dismiss stage of this lawsuit. So that does not affect the ruling on this point the Court made previously. And the additional contentions regarding BNSF's operational footprint and the importance of biometric access controls to its processes do not change the calculus.

First, it is not clear to the Court how the scope of BNSF's business as one of the largest railroad operators in North America has any bearing on the reasonableness of changing the company's biometric recordkeeping procedures. If anything, one could reasonably infer that a larger railroad operator has greater bandwidth than a smaller operator to implement facility-specific changes.

*6 Second, the claimed inherent importance of biometric access controls does not help BNSF either. Even if the

Court disregards the parties' factual dispute over whether biometric access controls are "integral" (which in itself suggests that summary judgment is inappropriate), BNSF has failed to point to evidence in the record indicating why the need to modify an "integral" procedure is inherently unreasonable. Evidence about compliance costs relative to transportation costs, for example, could shed light on the reasonableness of having to implement such changes. But given the absence of such evidence, the claimed adverse impact of BIPA compliance is highly speculative on the record before the Court.

The Court holds that ICCTA preemption does not apply.

### 3. FAAAA preemption

FAAAA preemption bars state law claims "related to a price, route, or service of any motor carrier ... with respect to the transportation of property." 49 U.S.C. § 14501(c). But it does not preempt state laws "affecting carrier prices, routes, and services in only a tenuous, remote, or peripheral manner." *Dan's City Used Cars*, 569 U.S. at 261 (cleaned up).

In denying BNSF's motion to dismiss, the Court rejected its FAAAA as-applied preemption argument because "the impact of the BIPA on motor carrier prices, routes, or services [was] 'too tenuous, remote, or peripheral' to give rise to FAAAA preemption." *Rogers*, 2019 WL 5635180, at *3 (quoting *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055 (7th Cir. 2016)). As with ICCTA preemption argument, BNSF's contention at that point was "highly speculative." *Rogers*, 2019 WL 5635180, at *3. BNSF contends that the record now suggests otherwise.

BNSF pins this argument on the notion that complying with BIPA "would materially impact the efficiency of [its] facilities' operations" because "employees would need to manually verify driver identities prior to allowing a driver on the property." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 22 (dkt. no. 107-1). To support this contention, BNSF cites only the proposition that it will need to manually verify identities "[w]ithout the use of the Remprex AGS's 'biometric reader.'" Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 54 (dkt. no. 128-2).

The Court finds this argument unpersuasive. BNSF relies on the unsupported premise that complying with BIPA will force it to entirely forgo the use of the preexisting system, a proposition that is not supported by the evidence. As Rogers points out, BNSF has implemented

Case: 1:22-cv-02456 Document #: 20 Filed: 06/10/22 Page 42 of 62 PageID #:93


the alternative RailPass biometric system, which complies with BIPA and yet does not rely on manual verification. Rogers also points to the undisputed evidence that at least one other major rail carrier has attempted to implement an informed consent regime for truck driver biometrics, which suggests that compliance is feasible. Furthermore, BNSF's own briefing undercuts its contention on this point. BNSF writes that BIPA compliance would lead to "*possibly eliminating* the use of biometrics," which is far short of the certainty that it claims. Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 22 (dkt. no. 107-1) (emphasis added). In short, BNSF's FAAAA preemption argument remains on the same speculative footing as earlier in the litigation.

The Court concludes that FAAAA preemption does not apply.

### 4. Merits
On the merits of Rogers's BIPA claim, BNSF argues that it did not actively or affirmatively collect biometric information. Instead, BNSF contends that only Remprex employees collected driver biometric information, such that BNSF at most possessed any biometric information and accordingly did not violate the law. *Cf.* 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier...."); *see also Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021) ("[T]his court concludes that for Section 15(b)'s requirements to apply, an entity must, at a minimum, take an active step to collect, capture, purchase, or otherwise obtain biometric data."); *Namuwonge v. Kronos, Inc.*, 418 F.Supp.3d 279, 286 (N.D. Ill. 2019) (explaining "there is a difference between *possessing* and *collecting* biometric information").

**\*7** There is conflicting evidence regarding BNSF's role in operating the AGS, such that summary judgment is inappropriate. *See, e.g.*, Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 24 (dkt. no. 128-2). On the one hand, BNSF points to evidence indicating that Remprex clerks primarily operate the AGS and register the truck drivers by scanning their fingerprints. BNSF also emphasizes that the AGS biometric information is stored on Remprex databases. Thus, BNSF says, Remprex is the party that Rogers should have sued.

On the other hand, Rogers points to e-mail address evidence suggesting that BNSF employees were also

involved in the registration of drivers, as well as contractual provisions that Remprex was obligated to provide BNSF employees with training on how to use the AGS. Rogers also underscores the admitted fact that "Remprex takes direction from BNSF regarding the management and use of the AG systems pursuant to a Master Agreement between the two entities," which tends to show that BNSF ultimately called the shots on whether and how biometric information was collected. Def.'s Resp. to Pl.'s Stat. of Add. Material Facts ¶ 10 (dkt. no. 139-1).

Viewing the evidence in the light most favorable to Rogers, a jury could find that BNSF, and not just Remprex, violated BIPA, whether by collecting, capturing, receiving through, or otherwise obtaining the biometric information at issue.

BNSF next argues that Rogers's claim is untimely because his biometric information was first collected on December 5, 2012, but he did not file his complaint until April 4, 2019.[4] This argument rests on a "one-and-done" theory of claim accrual, meaning the clock to file suit begins to run upon the first BIPA violation, and critically, never resets upon subsequent violations. Rogers disagrees and argues that the statute of limitations starts anew upon each BIPA violation. Thus, the question of timeliness hinges on the rules regarding when a BIPA claim accrues.[5]

---

[4]  The Illinois Appellate Court recently held that a five-year statute of limitations applies to claims under Section 15(b) of BIPA in *Tims v. Black Horse Carriers, Inc.*, 2021 IL App (1st) 200563 (1st Dist. Sept. 17, 2021). Because the Illinois Supreme Court has not yet decided this issue, and there is no basis to believe that it would decide the point differently from the appellate court, *Tims* controls this Court. *See Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently.").

[5]  The Seventh Circuit recently certified this question to the Illinois Supreme Court. *See Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1166–67 (7th Cir. 2021); *see also Watson v. Legacy Healthcare Fin. Servs., LLC*, 2021 IL App (1st) 210279, at *5 (Dec. 15, 2021) (rejecting the one-and-done claim accrual theory for BIPA). The Court is aware of this and is prepared to address any potential impact on the present case once the Illinois Supreme Court rules.

Rogers v. BNSF Railway Company, Slip Copy (2022)

Answering this question requires, first, examining BIPA's text. Section 15(b) provides:

> No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:
>
> > (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
>
> **\*8** (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> > (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 ILCS 14/15(b). Of note, the statute premises a violation on the triggering actions of collecting, capturing, etc., rather than the failure to provide notice or receive consent. The statutory language also does not differentiate between the initial and subsequent instances of when an entity collects biometric information, which might otherwise indicate a limitation on when a violation occurs. Accordingly, the Court agrees with Rogers and finds the plain text dispositive: the statute clearly provides that a private entity violates the law *each time* it fails to comply with the statute through one of the triggering terms, rather than only the first time. *See also Cothron v. White Castle Sys., Inc.*, 477 F. Supp. 3d 723, 732 (N.D. Ill. 2020) (interpreting section 15(b) as accruing upon every violation).

BNSF does not directly reply to Rogers's plain language argument. Instead, it contends that a one-and-done accrual rule typically applies to Illinois privacy torts, and that because BIPA is a privacy tort, the same rule would apply. In particular, BNSF points to Illinois invasion of privacy claims, on which a cause of action accrues at the time the privacy interest is first invaded, even if there are subsequent invasions of that interest.

The Court does not find this argument persuasive. Most important, Illinois courts have repeatedly held that courts must follow the statutory text when it is clear. *See, e.g.*, *Petersen v. Wallach*, 198 Ill. 2d 439, 447, 764 N.E.2d 19, 24 (2002). Because the Court finds BIPA's text clear, it does not matter that other Illinois torts, such as common law invasion of privacy claims, follow different claim accrual rules. The Court also notes BNSF makes no attempt to grapple with the text of the statute in its summary judgment briefing.

At bottom, the plain language of the statute controls. The clock for Rogers's BIPA claims reset upon each violation, meaning his claim in the present case is timely, as BNSF is claimed to have continued to scan his fingerprints dozens of times within the five years preceding this suit. The Court concludes that BNSF is not entitled to summary judgment on the merits of Rogers's BIPA claim.

**Conclusion**

For the foregoing reasons, the Court denies the defendant's motion for summary judgment [dkt. no. 107].

**All Citations**

Slip Copy, 2022 WL 787955

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5064732
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Katrina TARZIAN and Senia Hardwick,
individually and on behalf of all others
similarly situated, Plaintiffs,
v.
KRAFT HEINZ FOODS COMPANY,
Defendant.

18 C 7148
|
Filed 10/09/2019
|
Signed 10/10/2019

**Attorneys and Law Firms**

C.K. Lee, Lee Litigation Group, PLLC, Chicago, IL, for
Plaintiffs.

Kara L. McCall, Daniel Adam Spira, Sidley Austin LLP,
Chicago, IL, for Defendant.

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

**\*1** Before the Court is Defendant Kraft Heinz Foods
Company's ("Kraft") motion to dismiss Plaintiffs Katrina
Tarzian and Senia Hardwicks' (collectively, "Plaintiffs")
class-action complaint under Federal Rule of Civil
Procedure 12(b)(6). For the following reasons, the Court
grants the motion.

**BACKGROUND**

For purposes of this motion, the Court accepts as true the
following facts from the amended complaint. *Murphy v.
Walker*, 51 F.3d 714, 717 (7th Cir. 1995). All reasonable
inferences are drawn in Plaintiffs' favor. *Tamayo v.
Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Kraft is a limited-liability company organized under the
laws of Pennsylvania with its principal places of business
in Pittsburg and Chicago. It is a large-scale food

manufacturer that markets to all states, including Illinois
and New York. Kraft produces "Capri Sun" beverages in
a wide variety of flavors. Plaintiff Katrina Tarzian
("Tarzian") is an Illinois citizen and a resident of Cook
County. Plaintiff Senia Hardwick ("Hardwick") is a
citizen of New York State and a resident of Queens
County.

Plaintiffs Tarzian and Hardwick both purchased 10-packs
of Capri Sun beverages bearing a label stating the
products contain "no artificial preservatives." Plaintiffs
allege these claims are "deceptive and misleading," as
Capri Sun beverages contain citric acid, a preservative
alleged to be artificially produced on an industrial scale.

Specifically, Plaintiffs allege that citric acid can be
produced in several ways. Until the early 1900s, citric
acid was mainly produced by extraction from fresh fruits,
such as lemons and limes. In 1917, researcher James
Currie discovered that citric acid could be produced by
"cultivating Aspergillus Niger and allowing it to
metabolize sucrose or glucose to yield citric acid."
Plaintiffs do not specifically allege that Kraft uses citric
acid produced through Aspergillus Niger fermentation;
rather, they allege that it is more economically viable to
produce citric acid for industrial use through this
fermentation process. They further allege that Capri Sun
contains industrially produced citric acid.

As a result of Kraft's allegedly misleading labeling,
Plaintiffs allege that they sustained an injury by being
denied the benefit of their bargain. They assert that they
would not have purchased the Capri Sun beverages had
they known that the drinks contained citric acid.

Based on these allegations, Plaintiffs filed their first
amended class action complaint on March 03, 2019.
Count I asserts violations of the Illinois Consumer Fraud
and Deceptive Business Practices Act ("ICFA") and seeks
monetary damages and injunctive relief on behalf of a
nationwide class ("nonresident Plaintiffs").[1] 805 ILCS §§
505/1 *et seq.* Count II asserts violations of New York's
Deceptive and Unfair Trade Practices Act and seeks
injunctive relief on behalf of a New York class under
New York's General Business Law ("NY GBL") § 349.
Count III asserts violations of New York's False
Advertising Law and seeks monetary damages on behalf
of the New York class and Plaintiff Hardwick. On March
21, 2019, Defendants moved to dismiss all three counts
under Federal Rule of Civil Procedure 12(b)(6).

[1]     Count I asserts claims only on behalf of a nationwide
        class. Although Plaintiff Tarzian is named in the
        complaint, there are no counts asserting claims on her

behalf or on behalf of any other Illinois plaintiff. *Compare* Count I with Counts II & III (asserting claims on behalf of Plaintiff Hardwick individually, as well as on behalf of members of the New York class). To the extent Plaintiffs attempt to assert claims under the laws of the 50 other states, they fail to state a cognizable claim. Plaintiffs' empty assertion that the laws of other states are substantively like Illinois law is insufficient to meet the pleading standard for fraud claims. *Spector v. Mondelez Int'l Inc.*, 178 F. Supp. 3d 657, 664–65 (N.D. Ill. 2016) ("A complaint alleging a violation of consumer fraud must be plead with ... particularity and specificity."). The Seventh Circuit has made clear that actions such as the one plaintiff proposes are disfavored. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules.")

## LEGAL STANDARD

**\*2** A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations but must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow ... the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that contains factual allegations that are "merely consistent with a defendant's liability ... stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 677 (internal quotations omitted). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests.' " *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

A party "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). That fraud must be pled with particularity "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong*

*Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). The requirement is not rigid, and what must be alleged will vary depending on the facts of the case. *Id.* at 442. The heightened pleading standard applies to all *allegations* of fraud (such as a misrepresentation), not merely *claims* labeled fraud. *Id.* at 447.

## DISCUSSION

Kraft urges the Court to dismiss Plaintiffs' class-action complaint for three reasons. First, Kraft argues that the ICFA does not apply to Plaintiffs injured outside of Illinois. Second, Kraft argues Plaintiffs lack standing to seek injunctive relief for their claims. Third, Kraft argues Plaintiffs have failed to allege an actionable misrepresentation. The Court addresses each argument in turn.

## I. Claims Under the Illinois Consumer Fraud Act

Kraft argues that nonresident Plaintiffs have no standing to assert claims under the ICFA. They contend that Capri Sun purchases by out-of-state putative class members have no connection to Illinois, and the fact that one of Kraft's two headquarters is in Illinois is insufficient to confer ICFA standing on nonresident Plaintiffs. Plaintiffs concede that several factors weigh against the ICFA reaching their claims, but argue that Illinois is the location of Kraft's headquarters, it is where the deceptive claims were made, and the complaints and profits ensuing from the misrepresentation flowed back to Illinois. Plaintiffs assert that this is sufficient for the ICFA to reach their claims. Kraft replies that the complaint contains no factual allegations supporting Plaintiffs' argument about the flow of complaints and profits ensuing from the misrepresentation. The Court agrees with Kraft.

**\*3** Illinois statutes usually have limited territorial reach. The ICFA is no exception, and it does not "apply to fraudulent transactions which take place outside Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005). In *Avery*, the Supreme Court of Illinois considered whether the ICFA applied to an insurance fraud claim based on alleged misrepresentations made by an Illinois insurer in four separate documents that the plaintiffs received at various times and locations throughout their course of dealings with the defendant. *Avery*, 835 N.E.2d at 853. The *Avery* court acknowledged that "it can be difficult to identify the situs of a consumer transaction when ... the transaction is made up of components that occur in more than one state." *Id.* In such

cases, the *Avery* court instructed courts to consider "[t]he place of injury or deception," among other factors, to decide whether "the circumstances relating to the transaction occur primarily and substantially" in Illinois. *Id.* at 854. Accordingly, a nonresident plaintiff has standing under the ICFA where "the circumstances that relate to the disputed transaction," including the place of injury or deception, "occur[ed] primarily and substantially in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (quoting *Avery*, 835 N.E.2d at 853–54).

When determining whether a nonresident plaintiff may bring an ICFA claim, courts engage in a highly fact-bound inquiry that considers several factors including: (1) the plaintiff's residence; (2) the defendant's place of business; (3) the location of the relevant item that is the subject of the disputed transaction; (4) the location of the Plaintiff's contacts with the defendant; (5) where the allegedly deceptive statements were made; (6) where payments for services were to be sent; and (7) where complaints about the goods or services were to be directed. *See Crichton*, 576 F.3d at 396; *see also The Clearing Corp. v. Fin. and Energy Exch. Ltd.*, 2010 WL 2836717, *6 (N.D. Ill. 2010) (citing *Avery*, 296 Ill.Dec. 448, 835 N.E.2d at 854–855); *Haught v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *3 (N.D. Ill. 2012).

Unlike *Avery* where the defendant made the alleged misrepresentations throughout its course of dealing with plaintiffs, the misrepresentations alleged here were made on product labels during straightforward retail purchases across the nation. Plaintiffs argue that the deception occurred in Illinois because the scheme allegedly originated here. This allegation is insufficient to show that the misrepresentation occurred in Illinois. *Haught*, 2012 WL 3643831 at *4 (finding the fact that scheme allegedly "emanated" from Illinois was insufficient to allow ICFA claims by nonresident) (internal citations omitted). Moreover, Kraft correctly points out that the complaint does not contain any allegations to support Plaintiffs' argument that profits or complaints that ensued from the alleged misrepresentation flowed back to Illinois. As such, the Court finds that Plaintiffs failed to allege that the situs of the transactions at issue occurred "primarily and substantially" in Illinois. *Avery*, 835 N.E.2d at 853. Accordingly, the Court will dismiss Count I on behalf of the nonresident Plaintiffs for lack of standing under the ICFA.

## II. Injunctive Relief Under Section 349 of the NY GBL

Kraft argues that Plaintiffs do not have standing to seek

injunctive relief because they already know that Capri Sun contains citric acid and they are, therefore, unlikely to be harmed again. Plaintiffs respond that if Kraft were correct, consumer protection statutes such as the ICFA could never be invoked to enjoin deceptive practices because a complaining consumer's standing would dissipate the moment she discovers the alleged deception. The Court agrees with Kraft.

To establish standing to seek injunctive relief, Plaintiffs must allege not only "past exposure to illegal conduct" but also that such conduct is accompanied either by "continuing, present adverse effects," *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974), or, more relevant to this case, "a sufficient likelihood that [plaintiff] will again be wronged in a similar way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The Seventh Circuit has held that a plaintiff who merely alleges past harm by a deceptive sales practice faces no real and immediate threat that the same practice will deceive him after he becomes aware of the deception, and he is therefore not entitled to pursue injunctive relief. *See Camasta v. Jos. A. Bank Clothiers*, 761 F.3d 732, 73435 (7th Cir. 2014); *see also In re Herbal Supplements Mktg. & Sales Practices Litig.*, 2017 WL 2215025, at *8 (N.D. Ill. 2017); *Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *7 (N.D. Ill. 2017) (citing *Lyons*, 461 U.S. at 102).

**\*4** Courts in this district have interpreted *Camasta* to allow plaintiffs standing to seek injunctive relief where it is plausible that the plaintiff will purchase the product again. *See, e.g., Curran v. Bayer Healthcare LLC*, 2019 WL 398685, at *5 (N.D. Ill. 2019) (finding plaintiff alleged future harm sufficiently by expressing continued desire to purchase product if assured correct SPF rating is stated on packaging). But where the complaint failed to allege that the plaintiffs were likely to repurchase the products, courts concluded that plaintiffs had no standing to seek injunctive relief. *See, e.g., Bohn v. Boiron, Inc.*, 2013 U.S. Dist. LEXIS 107928, *711, 2013 WL 3975126 (N.D. Ill. 2013) (finding plaintiff did not have standing where she alleged that she "would not have purchased Defendants' Product" had she known the truth about its misrepresentations); *Mednick v. Precor, Inc.*, 2016 WL 5390955, at *9 (N.D. Ill. 2016) ("While it is desirable that Precor's prospective customers not be deceived by the company's allegedly false advertising, the named Plaintiffs 'cannot rely on the prospect that other consumers may be deceived' to boost their own standing.").

The complaint, in this case, alleges that "Plaintiffs and Class members did not know, and had no reason to know, that the Products were misbranded and misleading as set

forth herein, *and would not have bought the Products had they known the truth about them.*" 1:18-cv-07148, Dkt. 22 at ¶ 53 (emphasis added). Given this allegation, the Court finds it implausible that the Plaintiffs would again purchase the products at issue here. Thus, Plaintiffs have not alleged "a sufficient likelihood that [they] will again be wronged in a similar way," *Lyons*, 461 U.S. at 111 (1983). The Court accordingly will dismiss Count II for lack of standing to seek injunctive relief.

### III. NY GBL § 350 and Common-Law Fraud

New York's General Business Law ("NY GBL") § 350 states that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." To state a claim under the NY GBL § 350, a plaintiff must allege that defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). Similarly, to state a claim for common-law fraud plaintiff must allege facts showing defendant made "(1) material representations of past or existing fact, (2) that were false, (3) made with knowledge of their falsity or in regardless disregard thereof, (4) and justifiably and detrimentally relied on by the Plaintiffs." *Clark v. Integrity Financial Group, Inc.*, 2002 U.S. Dist. LEXIS 14708, 2002 WL 1821771 (S.D. Ind. June 25, 2002).

Plaintiffs allege that Capri Sun contains industrially manufactured citric acid, and industrial citric acid is artificial because it is usually produced through the industrial fermentation process. Kraft argues Plaintiffs' insufficiently allege that Kraft's statements that Capri Sun contains "no artificial preservatives" are false or misleading. Kraft contends these allegations are insufficient to link fermented citric acid to that used in Capri Sun. The Court agrees.

Plaintiffs' allegations detail the practices commonly used to manufacture citric acid throughout the industry before concluding: "Thus, Defendant's citric acid is artificial." That is too great of an inferential leap. To satisfy the pleading standards, Plaintiffs need to draw a connection between the common industry practice and the actual practice used by Kraft. Even drawing all reasonable inferences in the Plaintiffs' favor, the complaint fails to draw this nexus, and the Court cannot draw it for Plaintiffs. Because Plaintiffs' allegations do not link the allegedly artificial citric acid to the actual citric acid used by Kraft, Plaintiffs have failed to allege sufficient facts showing that Kraft's "no artificial preservatives" statement was false. Therefore, the Court will dismiss Counts III and IV.

### CONCLUSION

**\*5** For the reasons mentioned above, the Court grants the Defendants' motion to dismiss. It is so ordered.

### All Citations

Not Reported in Fed. Supp., 2019 WL 5064732

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033556
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

VALLEY AIR SERVICE, Plaintiff,
v.
SOUTHAIRE, INC., et al., Defendants.

No. 06 C 782.
|
April 16, 2009.

**Attorneys and Law Firms**

Alan L. Farkas, Michael Sweeney McGrory, Madsen, Farkas & Powen, L.L.C., Jeffrey D. Waltuck, Attorney at Law, Joseph R. Marconi, Mark D. Johnson, Victor J. Pioli, Johnson & Bell, Ltd., Chicago, IL, Joseph Michael Lamonaca, Joseph Michael Lamonaca, PC, Chadds Ford, PA, for Plaintiff.

Chad William Main, Christopher E. Kentra, Meckler Bulger Tilson Marick & Pearson LLP, Chicago, IL, Charles T. Coleman, Kyle R. Wilson, Wright, Lindsey & Jennings LLP, Little Rock, AR, Paul D. Morris, Wright, Lindsey & Jennings LLP, Rogers, AR, Joseph Michael Lamonaca, Joseph Michael Lamonaca, PC, Chadds Ford, PA, for Defendants.

***MEMORANDUM AND ORDER***

BLANCHE M. MANNING, District Judge.

**\*1** Valley Air Service contracted with Southaire to purchase an airplane which was to be repaired, refurbished, and customized by Central Flying Service pursuant to a contract between Central Flying and Southaire. Contending that the plane was a lemon and that it was defrauded into making fruitless repairs, Valley Air Service sued Southaire, Edward Brunner (Southaire's President), Central Flying Service and William Englert (Central Flying's Director of Light Jet Maintenance). Southaire and Brunner as well as Central Flying and

Englert have each filed motions for summary judgment. For the following reasons, the following counts will be tried: Count I (breach of contract against Southaire), Count II (common law fraud against Southaire and Brunner), and Count VI (common law fraud against Central Flying and Englert).

**I. Background**

The following facts[1] are drawn from the parties' Local Rule 56.1 statements.[2] Because the defendants elected not to respond to Valley Air's statement of additional facts, except to say that they believe that all of these facts are irrelevant to the issues presently before the court, those facts are deemed admitted for purposes of the motions for summary judgment. *See* Local Rule 56 .1(b)(3)(C).

[1]     The court will disregard legal conclusions in Valley Air's responses to the defendants' statement of facts.

[2]     The court notes that Central Flying submitted exhibits in support of the defendants' joint statement of facts, and then Central Flying, Southaire, and Valley Air all submitted additional exhibits, many of which overlap. The parties' practice of attaching portions of the same documents as different exhibits to their own filings creates unnecessary complexity in the record. For example, when responding to the portions of the defendants' statement of facts addressing Central Flying's Exhibit A, Valley Air disputes the defendants' characterization of the record and directs the court's attention to its Exhibit 8, which turns out to be the same letter of intent. Similarly, Southaire attaches portions of Edward Brunner's deposition as its Exhibit E. Valley Air also provided additional portions from this same deposition as its Exhibit 18, requiring the court to piece together the deposition to the extent possible to follow the parties' arguments. The need to cross-reference exhibits is inefficient and contributes to a general air of chaos in the parties' Rule 56 submissions. The court will provide citations to the parallel documents so the reader can join the court in the unenviable task of cobbling the record together, with several pages of one document in one place, and other pages elsewhere.

**A. Jurisdiction and Venue**
Plaintiff Valley Air Service is an Illinois corporation with

its principal place of business in Illinois.[3] Defendant Southaire, Inc. is a Tennessee corporation with its principal place of business in Tennessee. Defendant Central Flying Service, Inc. is an Arkansas corporation with its principal place of business in Arkansas. Central Flying is not registered to do business in Illinois. Edward Brunner (Southaire's President) is a Tennessee citizen, and William Englert (Central Flying's Director of Light Jet Maintenance) is an Arkansas citizen. It is undisputed that Valley Air Service seeks well over $75,000 in damages in connection with the plane, which cost approximately $2M.

[3]    Stephen Cosyns (Valley Air's President) is listed on the docket as a plaintiff and counter-defendant, but he is not included in the caption of the second amended complaint or the "parties" section of the complaint. The clerk is directed to correct the docket to remove him as a separate party. *See* Docket No. 204 (stipulation that Stephen Cosyns is not a party).

The court previously denied motions to dismiss filed by the defendants based on the alleged lack of personal jurisdiction. It also found that venue was proper in Illinois and invited both Central Flying and Englert to file proper motions to transfer venue, but they never did so. *See* Docket No. 65 at 6 (December 15, 2006, Memorandum and Order denying Central Flying's motion to transfer venue without prejudice because the issue was raised for the first time in a reply memorandum); Docket No. 133 at 10 (January 3, 2008, Memorandum and Order finding that venue was proper in Illinois and noting that Englert should file a motion to transfer venue if he believed that Arkansas was a more appropriate venue). Thus, although Central Flying attempts to challenge venue in the defendants' joint statement of facts, its challenge is untimely. *See* Defendants' Joint Statement of Facts at ¶ 3.

### B. The Decision to Purchase the Aircraft

Stephen and Maureen Cosyns are the husband-wife operators of Valley Air, a small company in Illinois that is in the business of operating charter flights. In 2005, the Cosyns decided to purchase a small jet to improve the flight experience of their current clients and attract new clients. They ultimately became interested in a 1983 Cessna Citation 500, serial no. 550–0478, registration no. N17WC, offered by Southaire.

**\*2** Southaire and Valley Air signed a letter of intent to purchase the aircraft on August 12, 2005. Central Flying's Exhibit A/Valley Air's Ex. 8 (Letter of Intent to

Purchase). The letter stated that it "is anon-binding letter of intent and shall not be construed as an offer, an agreement, or a memorandum of agreement." *Id.* at 3, ¶ 18. Nevertheless, the letter specified that Southaire would pay for the aircraft to undergo Phase I–V Inspections and preparedness inspections per the Cessna Citation manual at Central Flying in Little Rock, Arkansas. *Id.* at ¶ 3. It also stated that the aircraft would undergo refurbishment of the paint and interior at Central Flying's location and that Central Flying would review all of the log books. *See id.* at ¶¶ 5, 7.[4]

[4]    Valley Air disputes the defendants' representation that the aircraft would undergo refurbishment of the paint and interior at Central Flying's location and that Central Flying would review all of the log books. In support, it points to portions of the letter of intent that essentially say this, but with different wording. *See* Plaintiffs' Response to Defendants' Joint Statement of Facts at ¶ 5 (disputing the defendants' fact and stating that "Seller agrees that the Aircraft is to remain at Central Flying Service in Little Rock, Arkansas for refurbishment that includes new Paint, Interior and Avionics not to exceed $100,000.00 (One Hundred Thousand). Any costs exceeding the above price shall be the responsibility of Buyer ... The cost of refurbishment, up to $100,000, shall be paid by Seller ..... Seller agrees that as of the Closing all log books shall be complete and reviewed by FAA approved maintenance facility (Central Flying Service, Little Rock Arkansas) at inspection/pre-buy." Central Flying Exhibit B at ¶¶ 5, 7. The basis of this objection is unclear, as a party preparing a Rule 56.1 statement must accurately summarize the evidence but need not quote that evidence. Paragraph 5 easily meets this standard. This example is illustrative, so the court will not summarize the other similarly baseless objections from Valley Air in this order.

### C. Repairs to the Aircraft/Valley Air's Decision to Purchase the Plane

In the summer of 2005, Southaire delivered the plane to Central Flying so Central Flying could inspect it. *See* Central Flying's Ex. C (Central Flying Proposal). As a result of that inspection, on August 2, 2005, Central Flying sent Southaire a proposal to perform certain work on the plane. *Id.* Examples of the kind of repairs in the proposal are replacing a defective strobe light, correcting the pressure in the anti-skid nitrogen bottle, and fixing a chipped windshield. *Id.* at C3–C4. The proposal and attached "standard terms and conditions" do not mention Valley Air and refer to Southaire as the customer. *Id.* Central Flying performed work on the plane pursuant to

work orders between Southaire and Central Flying, although the record does not specify precisely what work was ultimately performed. *See id.*

Later that month, Ed Brunner (the President of Southaire) and Stephen Cosyns (the President of Valley Air) signed an Aircraft Sale and Purchase Agreement. *See* Central Flying's Exhibit B/Valley Air's Ex. 9 (Aircraft Sale and Purchase Agreement, signed by Brunner on August 16, 2005, and Cosyns on August 21, 2005). Southaire and Valley Air were the only parties to this contract. *Id.* The contract between Southaire and Valley Air contained a forum selection clause that provided that Illinois law would control. *Id.*

Section 6.2 of the Aircraft Sale and Purchase Agreement is entitled "Pre–Purchase Inspection" and provides in pertinent part that:

(a) The Aircraft and the Aircraft documents have already been delivered to Central Flying Services, Little Rock, Arkansas ("the Inspection Facility") for the purpose of enabling the Inspection Facility to conduct (at Seller's expense) an inspection ("Pre–Purchase Inspection") of the Aircraft.

(b) The parties acknowledge that the Pre–Purchase Inspection will consist of, at Seller's cost, The Phase I–V inspections, which must be signed off in accordance with the Cessna Citation Model 550 Maintenance Manual. Buyer will perform an acceptance flight after the aircraft has both completed the Phase I–V Inspections and completion of the refurbishment consisting of the new paint and interior. This flight is not to exceed one hour (60 minutes) with Buyer's representative onboard for this flight. All associated costs with the flight are to be borne by the Seller. Seller agrees to allow $25,000 (Twenty–Five Thousand Dollars) to remain in Escrow until the aircraft has completed all the Part 91 required inspections and refurbishment process and the Buyer has successfully made an Acceptance/Test Flight. This money is for rectification of any discrepancies noted on the flight. After which the fill amount or balance of sum shall be returned to SouthAire.

**\*3** (c) If the Pre–Purchase Inspection reveals that the Aircraft is not airworthy (as such term is customarily used and defined in the industry) or otherwise has material FAA Part 91 deficiencies, then unless this Agreement is terminated by Buyer as provided in subparagraph (d) below, the cost of correction of all airworthiness deficiencies and Part 91 deficiencies shall (i) be performed by the Inspection Facility and (ii) paid by the Seller. Seller hereby agrees to correct and to pay for the correction of all airworthy and Part 91 deficiencies. The Parties agree to negotiate reasonably regarding the setting of a timetable for the correction of any airworthiness deficiencies. If, after three business days, the Parties are unable to mutually agree to a timetable for correction of the airworthiness deficiencies in less than 30 days, then the transaction shall be terminated as provided in this Agreement.

(d) If the Pre–Purchase Inspection reveals that the Aircraft is in a condition not acceptable to Buyer in its sole and absolute discretion, then (i) Buyer may terminate this Agreement by written notice to Seller, (ii) the Deposit shall be refunded to Buyer, (iii) the fees of the Escrow Agent shall be paid equally by the parties, and (iv) thereafter neither party shall have any further obligation to the other hereunder.

(e) If the Pre–Purchase Inspection reveals that the Aircraft is in a condition that is acceptable to Buyer in its sole and absolute discretion, then Buyer shall execute and deliver to Seller a written certificate (an "Airfare Acceptance Certificate"), whereupon Seller shall make no further use of the Aircraft and the Closing Date shall be scheduled for seven (7) business days following receipt of the Airfare Acceptance Certificate by Seller ....

*Id.* at 4, ¶ 6.2(a).

Central Flying originally worked exclusively with Southaire to determine what work to perform on the plane, and entered into a contract with Southaire to perform work. However, at some point after Valley Air signed the Aircraft Sale and Purchase Agreement, Central Flying became aware that Valley Air would be the plane's ultimate owner. As such, Central Flying attempted to satisfy both the actual owner of the plane (Southaire) and the future owner of the plane (Valley Air) when performing work on the plane. *See* Valley Air Ex. 15 (John Shirley Dep.) at 40–43, 67–68.

Central Flying also sent Valley Air proposals to perform additional work on the plane. *See* Valley Air Ex. 14. The proposals included upgraded finishes inside the plane (*e.g.,* replating all the interior hardware, changing the existing countertop to a solid surface material, and modifying the existing seating to emulate Cessna Bravo seat styling), removing the existing communications system and installing new equipment, installing an XM weather link and flight date display monitors, and removing the left engine starter/generator (with 200 hours remaining) and installing a new unit. *Id.* Valley Air was responsible for paying for some of this work. *See* Valley Air Ex. 15 (John Shirley Dep.) at 67–68; Valley Air Ex. 4 (emails between Central Flying and Valley Air).

**\*4** One of the subcontractors used by Central Flying performed work (correcting a fuel leak) that was not reflected in the relevant work order, which was dated October 12, 2005. Valley Air Ex. 6 (Englert Dep.) at 23, 36.

**D. Inspection and Delivery of Possession of the Plane**

**1. Pre–Purchase Inspections**

Central Flying conducted the Phase I–VInspection of the plane at Central Flying's facility in Arkansas. See Valley Air's Ex. 20 (Central Flying invoice dated October 12, 2005).

In addition, before Valley Air decided to finalize the purchase of the plane in October of 2005, it asked its then chief pilot, Michael Patrick, to become involved with the plane's preflight inspection. Valley Air Ex. 19/Central Flying's Ex. E (Patrick Dep.) at 7–8.[5] Patrick and Stephen Cosyns thus went to Central Flying's facility in Arkansas and Cosyns "look[ed] over the airplane." *Id.* at 8. When doing so, he "followed the checklist, preflighted the airplane." *Id.* at 9. He found an inoperative landing light and low brake fluid but did not find any other discrepancies. *Id.*

[5]     The court reminds Central Flying's counsel to ensure that they always include the first page of a deposition excerpt so the identity of the deponent is clear. *See, e.g.,* Central Flying's Ex. E.

Cosyns also testified that he inspected the plane when he arrived in Arkansas. According to Cosyns, in addition to the issues identified by Patrick, he found "many other discrepancies that I just don't recall." Valley Air Ex. 11 (S. Cosyns Dep.) at 73. He told Englert about these deficiencies, and was not aware that any of the deficiencies still existed as of a few days later on October 11, 2005, when he flew the plane from Arkansas to Illinois. *Id.* at 73–74.

Patrick testified that the plane was serviced to his satisfaction prior to departure. Valley Air Ex. 19/Central Flying's Ex. E (Patrick Dep.) at 7–8. As chief pilot,

Patrick was not responsible for writing up discrepancies. *Id.* at 12. However, Patrick would not have flown the plane if there were any discrepancies. *Id.* at 14. Similarly, Stephen Cosyns testified that a preflight inspection is necessary and that "[a]n airplane cannot fly" if there are any discrepancies. Valley Air Ex. 11 (S. Cosyns Dep.) at 74.

**2. Delivery**

On October 11, 2005, Southaire delivered possession of the aircraft to Valley Air and Stephen Cosyns, on behalf of Valley Air, signed an "Aircraft Delivery Receipt" and "Aircraft Acceptance Receipt." Southaire Exhibit A (Aircraft Delivery Receipt); Southaire Exhibit B (Aircraft Acceptance Certificate). The Aircraft Delivery Receipt stated that "Buyer hereby accepts delivery of the Aircraft" and specified that "[t]he aircraft is accepted on the terms and subject to the Aircraft Purchase Agreement." Southaire Exhibit A. In turn, the Aircraft Delivery Receipt stated:

Pursuant to the Aircraft Sale and Purchase Agreement ("Agreement") effective the 11th day of October, 2005, by and between:

Ed Brunner, Southaire, Inc. ("Seller") and Stephen M. Cosyns, Valley Air Service, Inc. ("Buyer")

Buyer has conducted a Pre–Purchase Inspection of the following aircraft:

**\*5** Aircraft Make and Model: 1983 CESSNA CITATION 550

Manufacturer Serial Number: 550–0478

Registration Number: N17WC

together with the engines installed thereon, and together with any and all existing avionics, equipment and accessories (loose or installed), as listed in Exhibit A of the Purchase Agreement (collectively, the "Aircraft").

Based on the results of the Pre–Purchase Inspection, Buyer has determined that:

The condition of the Aircraft is *not* satisfactory to Buyer. The Agreement shall be terminated, and any amounts paid by Buyer shall be immediately refunded

as provided in the Agreement.

_____ The condition of the Aircraft is satisfactory to Buyer.

*X* The condition of the Aircraft is satisfactory to Buyer subject to Seller's timely correction of the deficiencies listed in the attachment hereto. Note that sidepanel materials, countertop, laminate and seat leather was not what was ordered and installed by Central Flying Service.

Southaire Ex. B.

Following delivery of the plane, Valley Air flew it from Arkansas to Illinois.

### E. Condition of the Plane

#### 1. Aircraft Sale and Purchase Agreement—Seller Representations and Warranties

The Aircraft Sale and Purchase Agreement contained a section entitled "Seller Representations and Warranties." Valley Air Ex. 9 at § 5 (Aircraft Sale and Purchase Agreement). This section specified that Southaire would convey good title and that the plane had a valid FAA Certificate of Airworthiness "and is in airworthy condition with all systems in normal operating condition, per the manufacturer's maintenance and operating manuals and specifications." *Id.* at § 5(a) & (b). Other relevant provisions included:

§ 5(c) (in which Southaire warranted that the documents and log books were complete and accurate for the time that Southaire owned the plane, and that for the period before it owned the plane, those materials were accurate and complete to the best of its knowledge);

§ 5(d) (the plane had all required inspections prior to the closing date and all airworthiness directives and mandatory service bulletins have been complied with),

§ 5(e) ("The Aircraft does not now have, nor has it had in the past, any structural or corrosion damage except

as noted in the logbooks");

§ 5(h) ... (The Aircraft has not incurred damage during Seller's period of ownership, or the ownership of the prior owner of said aircraft, said owner being a customer of seller, and no damage history is reflected in the Aircraft's records from the time of the first delivery by the manufacturer, except as specifically noted in Exhibit "B");[6] and

[6] Exhibit B is the Aircraft Acceptance Certificate which is also attached as Southaire Exhibit B. The Aircraft Delivery Receipt that was executed stated that "Buyer hereby accepts delivery of the Aircraft" and specified that "[t]he aircraft is accepted on the terms and subject to the Aircraft Purchase Agreement." It did not, however, list any damage history.

§ 5(j) ("said aircraft is in compliance with all FAA Part 91 regulations and specifications").

#### 2. Post–Purchase Flights/Inspections

Patrick traveled back to Illinois in the plane after it was purchased on October 11, 2005. *See* Valley Air. Ex. 19/Southaire Ex. C (Patrick Dep.) at 11. During that flight, he was still Valley Air's Chief Pilot and served as second-in-command, while Cosyns was the pilot-in-command. As noted above, Patrick preflighted the plane and found low brake fluid, which was replenished prior to departure, as well as an inoperative landing light. In addition, Patrick testified that during the flight, Cosyns told him that he believed that the trim was almost to its limit.[7]

7    The parties do not provide any specifics, but a trim system appears to be designed to alleviate control forces required to maintain a steady flight. *See generally* http://www.grc.nasa.gov/WWW/K–12/airplane/trim.html (last visited Apr. 16, 2009).

**\*6** Bruce Rebechini, "who performed some maintenance on the Aircraft after Valley Air took possession," Valley Air's Additional Facts at ¶ 25, opined that it can take several hours of flight before a deficiency becomes apparent, but could not point to any manual, study, or document supporting this opinion.[8] Valley Air Ex. 13 (Rebechini Dep.) at 112. He also opined that a one-hour test flight should be sufficient for a Cessna Citation, but might not be long enough for some people. He based this opinion on his experience in the aviation industry but noted that no manual, study, or document supporting this opinion existed. *Id.* at 111–12. FAA inspector James Kennedy, Valley Air's Additional Facts at ¶ 25, testified that it is possible for some conditions to manifest themselves on an intermittent as opposed to a continuous basis so that it would take more than one hour of flight to detect them. Valley Air Ex. 23/Southaire Ex. D (Kennedy Dep.) at 87–88.[9]

8    The deposition excerpt for Bruce Rebechini provided by Valley Air begins at page 42, so the court knows only that Rebechini—who appears to be some sort of airplane professional—worked at some point on the plane.

9    As with Rebechini, Valley Air provides deposition excerpts for Kennedy that omit the beginning of the deposition, when presumably counsel asked Kennedy about his current and past jobs. The parties' practice of submitting different portions of the same documents, however, has finally turned out to be helpful, as Southaire attached portions of Kennedy's deposition that indicate that in 2005, Kennedy was the FAA Principal Maintenance Inspector for Valley Air. Southaire Ex. D at 9.

Patrick was Cosyns's second-in-command for round trip flights between DuPage County Airport and Salt Lake City, Utah, on October 19, 2005, and October 28, 2005. Southaire Exhibit C/Valley Air Ex. 19 (Patrick Dep.) at 13–16. Patrick preflighted the plane for these flights and did not find any discrepancies. *Id.* at 13. He did not recall if Cosyns found any discrepancies prior to these flights, but stated that he would not have flown if he had been aware of any discrepancies. *Id.* at 14.

Patrick also testified that Cosyns told him he thought that the plane was leaking fuel, had improperly sealed windows resulting in a loss of cabin pressurization, and had a "precession problem with the gyro" but could not provide any specifics as to when these conversations occurred. *Id.* at 21–24. In addition, Patrick described a flight to Orlando on a date he could not recall where the plane had to make an emergency landing because of a problem that was determined to be the squat switch. *Id.* at 22. In all the times that Patrick was on the aircraft, he never was concerned about the safety of the flight, the safety of any passengers, or the plane's airworthiness. *Id.* at 26.

In October of 2005, after Valley Air took possession of the plane, Kennedy reviewed the plane's documents, conducted a "conformity check," and "physically inspected" the plane while it was on the ground in connection with FAA paperwork. Valley Air Ex. 23/Southaire Ex. D (Kennedy Dep.) at 14. The physical inspection necessary for the paperwork is not in-depth. *Id.* at 15. Kennedy testified that when he completed the FAA paperwork, he believed that the plane was "airworthy," "generally free from defect," and "suitable for safe flight." *Id.* at 32–34, 39. He then reviewed the list of discrepancies in Valley Air's complaint and clarified that he did not have personal knowledge as to whether certain of these alleged discrepancies existed, since he had not seen the plane in operation. *Id.* at 66–68. He also testified that if any of the discrepancies alleged by Valley Air existed and he had been aware of them, the plane would not be airworthy and would not have been allowed to fly. *Id.* at 35.

### 3. Past Damage to the Plane

**\*7** At his deposition, Brunner (Southaire's President) testified that he was not aware of any damage history to the aircraft. Valley Air Ex. 18/Southaire Ex. E (Brunner Dep.) at 67–68. Valley Air, however, notes that a quote dated August 18, 2005, on a Southaire form, states that "Fuselage and tops of wings all have major dents with filler. Sand, fill and fair all affected areas." Valley Air Ex. 24/Brunner Dep. Ex. 18, (August 18, 2005 Quote). When asked about this document, Brunner stated that, "yes, he was then aware of the dents" and that he became aware of the presence of major dents with filler on the fuselage and tops of the wings when Central Flying told him about the plane's condition in August of 2005. Valley Air Ex. 18/Southaire Ex. (Brunner Dep.) at 79–80.

The record also contains a discrepancy list from Central

Flying dated July 20, 2005, indicating that Central Flying advised Southaire that the co-pilot's side window was chipped (item 5021) and that there was corrosion under both rudder static wick bases (item 5025). Valley Air Ex. 17/Brunner Dep. Ex. 17 (Discrepancy List dated August 3, 2005) at 4. In this list, Central Flying listed prices for various work that it deemed necessary on the plane, and that Brunner was "sure" were brought to his attention. Valley Air Ex. 18/Southaire Ex. (Brunner Dep.) at 74. Southaire authorized Central Flying to perform avionics and maintenance work after reviewing the August 3, 2005, discrepancy list. *Id.* at 75.

#### 4. Valley Air's Position Regarding the Plane's Condition

Cosyns prepared an undated list of discrepancies (*i.e.,* problems with the plane) that were discovered after Valley Air took possession of the plane. Valley Air Ex. 10 (Discrepancy List). The problems included a fuel leak, improperly sealed windows, improper balance controls, a malfunctioning throttle, and inaccurate records. *Id.* He testified that the discrepancies should all have been discovered and corrected during a Phase I–V inspection. Valley Air Ex. 11 (S. Cosyns Dep.) at 116. Rebechini also testified that he believed that the Phase I–V inspection and necessary follow-up work had not been performed properly. According to Rebechini, if Central Flying had done so, the discrepancies discovered by Valley Air would not have existed. Valley Air Ex. 13 (Rebechini Dep.) at 52–55. As noted above, the discrepancy list also included the existence of undisclosed damage to the plane.

### II. Discussion

In its seven-count complaint, Valley Air asserts the following claims: breach of contract against Southaire (Count I), common law fraud against Southaire and Brunner (Count II), Illinois Consumer Fraud Act against Southaire and Brunner (Count III), breach of contract under a third party beneficiary theory against Central Flying (Count IV), negligent misrepresentation against Central Flying and Englert (Count V), common law fraud against Central Flying and Englert (Count VI), and Illinois Consumer Fraud Act against Central Flying and Englert (Count VII). Southaire and Brunner have moved for summary judgment as to Counts I, II, and III, and Central Flying and Englert have moved for summary

judgment as to Counts IV, V, and VII, but not Count VI.

**\*8** The contract between Southaire and Valley Air contained a forum selection clause that provides that Illinois law controls. The parties agree that Illinois law applies to all counts except Count V, which is directed at Central Flying and Englert, so the court will only conduct a choice of law analysis for this count and will otherwise look to Illinois law.

#### A. Standard for A Motion For Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.,* 970 F.2d 363, 365 (7th Cir.1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id.*

#### B. Breach of Contract Against Southaire (Count I)

Valley Air contends that Southaire breached the Aircraft Sale and Purchase Agreement by delivering a defective plane riddled with latent defects. Southaire, on the other hand, asserts that the record does not show that it breached the contract. In support, Southaire notes that Michael Patrick piloted the plane several times immediately following Valley Air's purchase and testified that he did not observe any of the claimed defects. It also stresses that James Kennedy, a Federal Aviation Administration official, inspected the plane and did not observe any of the claimed defects. In addition, Southaire asserts that to the extent that Valley Air is trying to state a claim for a breach of the implied warranty of merchantability, it cannot prevail as the plane was airworthy.

In essence, Southaire's position is that it performed its

obligations under the contract, Valley Air took a test flight as specified in the contract, Valley Air then gave Southaire a list of discrepancies, Southaire fixed them, and that is the end of the matter. According to Southaire, if there are indeed any other issues with the plane (which it denies), they are not its responsibility because it did everything it was required to do under the contract.

To prevail on a breach of contract claim under Illinois law against Southaire, Valley Air must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract by Valley Air; (3) a breach by Southaire; and (4) resultant damages. *TAS Distributing Co. v. Cummins Engine Co.,* 491 F.3d 625, 631 (7th Cir.2007). Element three—breach by Southaire—is the critical one for purposes of Southaire's motion for summary judgment on Valley Air's breach of contract claim.

**\*9** As noted by Southaire, Patrick flew on the plane and testified that he never was concerned about the safety of the flight, the safety of any passengers, or the plane's airworthiness. Kennedy similarly signed FAA paperwork allowing the plane to fly, and testified that he would not have done so had he known about the issues identified by Valley Air. Valley Air, on the other hand, disputes that the plane was airworthy and contends that Southaire delivered a plane that did not, among other things, have a proper Phase I–V inspection.

The court need not delve into the evidence about the plane's condition because Valley Air's breach of contract claim is not based solely on the portions of the contract regarding airworthiness. As noted by Valley Air, the contract also contained warranties by Southaire that the plane's records were complete and accurate for the time that Southaire owned the plane, and that for the period before it owned the plane, those materials were accurate and complete to the best of its knowledge. *See* Valley Air Ex. 9 at § 5(c) (Aircraft Sale and Purchase Agreement). Valley Air has pointed to evidence (which is deemed admitted for purposes of summary judgment since the defendants did not respond to Valley Air's statement of additional facts) indicating that the records were incomplete.

In addition, Brunner admitted that he knew that the plane had "major dents" on the fuselage and tops of the wings that had been filled. There is no explanation as to what, other than prior damage, could have caused these dents, and it is undisputed that Southaire did not disclose what appears to be structural damage to Valley Air before Valley Air took delivery of the plane. The contract, however, contains Southaire's warranty that "[t]he

Aircraft does not now have, nor has it had in the past, any structural or corrosion damage except as noted in the logbooks" and "has not incurred damage during Seller's period of ownership, or the ownership of the prior owner of said aircraft, said owner being a customer of seller, and no damage history is reflected in the Aircraft's records from the time of the first delivery by the manufacturer ..." *Id.* at § 5(e) & (h).

Thus, material issues of disputed fact exist as to whether Southaire breached its contract with Valley Air. Accordingly, the court must deny Southaire's motion for summary judgment as to its breach of contract claim (Count I).

### C. Common Law Fraud Against Southaire and Brunner (Count II)[10]

[10]    In Count VI, Valley Air asserts a similar claim of common law fraud against Central Flying and Englert. Central Flying and Englert, however, did not move for summary judgment as to this count.

Valley Air argues that Brunner and other Southaire employees made fraudulent statements about the plane's condition—including the claim that the plane had no damage history—to induce Valley Air to purchase the plane. In response, Southaire and Brunner essentially repeat their arguments regarding breach of contract and contend that the plane was airworthy. They also assert that no evidence shows that Brunner or anyone at Southaire knew about the alleged problems with the plane.

**\*10** To prevail on its fraud claim under Illinois law, Valley Air must establish that: (1) Southaire/Brunner made a false statement of material fact; (2) Southaire/Brunner knew the statement was false or made the statement in reckless disregard of the truth; (3) the statement was made with the intent to induce action; (4) Valley Air reasonably believed the statement and justifiably acted in reliance on it; and (5) Valley Air suffered damages as a result. *See Kapelanski v. Johnson,* 390 F.3d 525, 530–31 (7th Cir.2004), *citing Soules v. Gen. Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599 (Ill.1980).

The court's analysis begins and ends with Brunner's testimony about the existence of prior undisclosed damage to the plane. Southaire and Brunner stress, in their motion for summary judgment, that Brunner testified

that he was not aware of any damage history to the aircraft. It is true that Brunner made this statement at his deposition. However, when asked about a work order to repair the "major dents," Brunner admitted that, "yes, he was then aware of the dents" and that he became aware of the presence of major dents with filler on the fuselage and tops of the wings when Central Flying told him about the plane's condition in August of 2005.

Southaire and Brunner do not attempt to explain why the presence of "major dents" is not a material representation. Instead, they flatly assert—contrary to the record—that Brunner did not know about the dents. This is not supported by the record. Hence, Southaire and Brunner's motion for summary judgment as to Valley Air's fraud claim (Count II) is denied.

### D. Illinois Consumer Fraud Act Against Southaire and Brunner (Count III) & Central Flying and Englert (Count VII)

Southaire/Brunner and Central Flying/Englert seek summary judgment as to the Illinois Consumer Fraud Act claims directed at them. Southaire and Brunner contend that Valley Air's Consumer Fraud Act claim is, in fact, a claim for breach of contract, which is not actionable under the Consumer Fraud Act. In turn, Central Flying and Englert assert that the Illinois Consumer Fraud Act has no extraterritorial effect and thus does not apply to conduct occurring outside Illinois and that, in any event, Valley Air is not a consumer under the Act.

### 1. Southaire/Brunner

The Illinois Supreme Court has held that "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mutual Auto. Ins. Co.,* 216 Ill.2d 100, 169, 296 Ill.Dec. 448, 835 N.E.2d 801 (Ill.2005). Valley Air contends that this rule is inapposite because its Illinois Consumer Fraud Act claim is based on statements made by Southaire/Brunner to induce it to enter into the contract. Valley Air then notes that false statements made to induce a plaintiff to sign a contract (as opposed to a breach of contract claim) can form the basis for a Consumer Fraud Act claim. *See Pappas v. Pella Corp.,* 363 Ill.App.3d 795, 799, 300 Ill.Dec. 552, 844 N.E.2d 995 (1st Dist.2006) (Consumer Fraud Act claim based on misrepresentations about windows could proceed because there was "no evidence

that plaintiffs' claims are based on a simple breach of warranty or breach of contract" given that the "plaintiffs do not allege that [the defendant] breached any promises to them"). Thus, in essence, Valley Air contends that Southaire/Brunner fraudulently induced it to sign the contract so it can pursue an Illinois Consumer Fraud Act claim despite the Illinois Supreme Court's decision in *Avery.*

**\*11** Relying on *Avery,* the Seventh Circuit has held that a plaintiff cannot seek relief under the Consumer Fraud Act if it "seeks to enforce an unfulfilled contractual promise." *Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899, 902 (7th Cir.2006); *see also Wooley v. Jackson Hewitt, Inc.,* 540 F.Supp.2d 964 (N.D.Ill.2008); *Langendorf v. Conseco Senior Health Insurance Company,* 590 F.Supp. 1020, 1023–24 (N.D.Ill.2008). For example, in *Shaw v. Hyatt Int'l Corp.,* the plaintiff filed suit based on a misrepresentation on Hyatt's website regarding the room rate. The Seventh Circuit acknowledged that the advertised rate was "designed to lure potential guests into making a reservation." 461 F.3d at 902. Nevertheless, it rejected the plaintiff's Consumer Fraud Act claim because the plaintiff "[sought] to enforce an unfulfilled contractual promise." *Shaw v. Hyatt Int'l Corp.,* 461 F.3d at 902.

In the instant case, the contract contains specific language stating that the plane had no past damage. *See* Valley Air Ex. 9 at § 5(e) & (h) (Aircraft Sale and Purchase Agreement). Moreover, Valley Air has pointed to evidence supporting its claim that Southaire and Brunner breached the contract by, among other things, selling it a plane with undisclosed past damage. The court thus rejects Valley Air's attempt to proceed simultaneously on a breach of contract claim and a Consumer Fraud Act claim.

This conclusion is not altered by Valley Air's citation to *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation,* Nos. 05 C 2623, 05 C 4742 & MDL–1703, 2006 WL 3754823 (N.D.Ill.Dec.18, 2006). In that case, the plaintiffs alleged that the defendant deceptively advertised its proprietary line of Craftsman tools as manufactured exclusively in the United States when many of the tools were made outside the United States or contained a significant number of foreign parts. *Id.* at * 1. The court held that the advertising was an actionable misrepresentation, even though it was made to induce consumers to purchase Craftsman tools because the "Plaintiffs complain that Sears induced them to buy Craftsman tools by misrepresenting the country of origin of the tools, not simply that Sears made a false promise of future conduct." *Id.* at *3 n. 8.

It is important to note, however, that the misrepresentation about the origin of the tools at issue in *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation* was not directly addressed by a contract. In contrast, the contract between Southaire and Valley Air contains specific representations about the condition of the plane. Accordingly, Valley Air's Consumer Fraud Act claim is barred because it is a claim for breach of contract. Southaire and Brunner are, therefore, entitled to summary judgment as to Count III.

### 2. Central Flying/Englert

As stressed by Central Air and Englert, Valley Air contracted with Southaire to purchase the plane, and Central Air was not a party to this contract. Thus, Valley Air's Consumer Fraud Act claim against Central Flying and Englert is not affected by the Southaire—Valley Air contract. This does not spell victory for Valley Air, however, because Central Flying and Englert assert that the Illinois Consumer Fraud Act is inapplicable because the alleged fraud occurred primarily in Arizona and that, in any event, Valley Air is not a consumer under the Act.

**\*12** Valley Air contends that because it is an Illinois citizen, the Consumer Fraud Act necessarily is available regardless of where the wrongful activity occurred. Central Flying and Englert take a diametrically opposed position and point to the Illinois Supreme Court's statement in *Avery* that "the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d at 185, 296 Ill.Dec. 448, 835 N.E.2d 801. According to Central Flying/Englert, this means that the Consumer Fraud Act applies only to conduct that occurred 100% in Illinois.

The positions of both sides are at odds with the Illinois Supreme Court's decision in *Avery.* With respect to Valley Air, the Illinois Supreme Court surveyed cases interpreting the Consumer Fraud Act in a variety of ways and noted that some courts have concluded that the scope of the Act is limited "based on the residency of the plaintiff." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d at 182, 296 Ill.Dec. 448, 835 N.E.2d 801. The court then went on to adopt an entirely different test: whether "the circumstances relating to the transaction occur primarily and substantially within [Illinois]." *Id.* at 187, 296 Ill.Dec. 448, 835 N.E.2d 801. With respect to Southaire and Englert, the quoted sentence is out-ofcontext and does not fairly reflect the holding of the *Avery* decision.

The court thus turns to what the Illinois Supreme Court did actually hold in *Avery.* In determining if "the circumstances relating to the transaction occur[red] primarily and substantially within [Illinois]," this court must consider where the bulk of the circumstances making up the allegedly fraudulent transaction occurred. *Id.* at 185–86, 296 Ill.Dec. 448, 835 N.E.2d 801. There is no bright line test. *Id.* at 187, 296 Ill.Dec. 448, 835 N.E.2d 801. Instead, the court must conduct a case-by-case inquiry and focus on the place of injury or deception, the location of the parties, the location where relevant activities occurred, and the parties' contacts with Illinois. *Id.* at 188, 296 Ill.Dec. 448, 835 N.E.2d 801.

Here, Valley Air notes that if there are indeed latent problems with the plane, it is likely that Illinois residents will be affected since Valley Air operates flights out of Illinois. It also points out that it is an Illinois citizen, it felt injury in Illinois, and the plane is hangared in Illinois. Response at 19. Possible future harm to persons traveling on the plane caused by operation of the plane and the current location of the plane are not relevant to whether the circumstances relating to the alleged fraud "occur[red] primarily and substantially within [Illinois]." *Id.* at 185–86, 296 Ill.Dec. 448, 835 N.E.2d 801. This leaves the fact that Valley Air is an Illinois citizen and felt injury in Illinois. In addition, Valley Air communicated with Central Flying from Illinois.

On the other side of the balance, Central Flying is located in Arkansas, all of the work on the plane occurred in Arkansas, Valley Air conducted its test flight and accepted the plane in Arkansas, the Phase I–V inspections occurred in Arkansas, Central Flying reviewed all of the log books in Arkansas, and Valley Air took possession of the plane in Arkansas. The Phase I–V inspections and subsequent work on the plane are at the heart of Valley Air's fraud claim and constitute the overwhelming bulk of the circumstances relating to the alleged fraud. The fact that Valley Air took the test flight in Arkansas is also very meaningful. Valley Air performed the test flight to determine if it wanted to consummate the purchase, so what occurred during the flight and representations made about the plane before and after the flight, are critical.

**\*13** Thus, the fraud has some connection to Illinois. However, the court simply cannot conclude that the circumstances relating to the alleged fraud "occur[red] primarily and substantially within [Illinois]." *Id.* at 185–86, 296 Ill.Dec. 448, 835 N.E.2d 801. Accordingly, Valley Air's Consumer Fraud Act claim against Central Flying and Englert fails as a matter of law and Central Flying and Englert are entitled to summary judgment as to

Count VII. In light of this conclusion, the court will not address Central Flying and Englert's arguments about Valley Air's status as a consumer under the Consumer Fraud Act.

### E. Breach of Contract under a Third Party Beneficiary Theory Against Central Flying (Count IV)

Central Flying stresses that it contracted with Southaire, not Valley Air, so Valley Air is at best an incidental third party beneficiary of the Central Flying—Southaire contract and cannot proceed with a breach of contract claim against Central Flying. Valley Air, on the other hand, argues that it may sue Central Flying because Central Flying "knew from the very beginning that Valley Air was the ultimate user of the Aircraft" and thus knew that the Central Flying–Southaire contract was for the benefit of Valley Air. Valley Air Response at 13.

Only an intended beneficiary (as opposed to an incidental beneficiary) may assert rights pursuant to a contract under a third-party beneficiary theory. *See, e.g., B.C. v. J.C. Penney Co.,* 205 Ill.App.3d 5, 9–10, 150 Ill.Dec. 3, 562 N.E.2d 533 (1st Dist.1990). The key question before the court is, therefore, whether Valley Air was an intended or incidental beneficiary to the Southaire—Central Flying contract.

"[T]here is no question that the seminal and still vital Illinois authority as to third party beneficiaries is *Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 178 N.E. 498 (1931)." *F.W. Hempel & Co. ., Inc. v. Metal World, Inc.,* 721 F.2d 610, 613 (7th Cir.1983). In *Carson Pirie Scott,* the Illinois Supreme Court held that:

> The rule is, that the right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing can not be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability.

346 Ill. at 258, 178 N.E. 498.

Thus, when determining whether the contracting parties intended to benefit a third party directly, the court must consider the contract's express terms and the circumstances at the time the contract was executed. *F.W. Hempel & Co., Inc. v. Metal World, Inc.,* 721 F.2d at 613, *citing Carson Pirie Scott Co. v. Parrett,* 346 Ill. at 258,

178 N.E. 498; *Corrugated Paper Products, Inc. v. Longview Fibre Co.,* 868 F.2d 908, 913 (7th Cir.1989) (post-contract negotiations with a third party that stood to benefit from the contract were "virtually irrelevant to the parties' intent at the time the contract was executed" because only the circumstances at the time the contract is executed are pertinent).

**\*14** In addition, a party is not automatically precluded from filing suit as a third party beneficiary if its name is not in the underlying contract, as "[a] contract may define a third party by description of a class, and it is sufficient if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefitted." *Altevogt v. Brinkoetter,* 85 Ill.2d 44, 54–55, 51 Ill.Dec. 674, 421 N.E.2d 182 (1981). However, there is a strong presumption that parties intend contract provisions to apply only to themselves. *155 Harbor Drive Condominium Assoc. v. Harbor Point Inc.,* 209 Ill.App.3d 631, 645–46, 154 Ill.Dec. 365, 568 N.E.2d 365 (1st Dist.1991). To overcome this presumption, there must "practically be an express declaration." *Id.; see also Quinn v. McGraw–Hill Cos.,* 168 F.3d 331, 334 (7th Cir.1999) ("Express language in the contract identifying the third-party beneficiary is the best evidence of intent to benefit that party ..., but the courts have also accepted an implied showing where the implication that the contract applies to third parties is so strong as to be practically an express declaration") (internal citations and quotations omitted); *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.,* 78 Ill.2d 381, 386–87, 36 Ill.Dec. 338, 400 N.E.2d 918 (Ill.1980) (the party seeking to assert third-party beneficiary status "[was] a proper party plaintiff because it is a direct beneficiary clearly identified and intended in the contract before us").

As noted above, Valley Air seeks to proceed as a third party beneficiary based on its allegation that Central Flying knew that Southaire did not intend to keep the plane itself and, instead, was overhauling it in the hopes of eventually selling it to Valley Air. There are three problems with this argument. First, the contract is between Southaire and Central Flying, and Valley Air has not pointed to any language in the contract suggesting that Southaire and Central Flying intended to make Valley Air a direct beneficiary who can sue Central Flying directly. *See Altevogt v. Brinkoetter,* 85 Ill.2d at 54–55, 51 Ill.Dec. 674, 421 N.E.2d 182; *see also Sharif v. International Development Group Co., Ltd.,* 399 F.3d 857, 861 (7th Cir.2005) (looking to the parties' contract to determine if it manifests an intention to confer a benefit upon the third party).

Second, it is important to distinguish between direct and

incidental beneficiaries. "Illinois recognizes two types of third-party beneficiaries, intended and incidental. An intended beneficiary is intended by the parties to the contract to receive a benefit for the performance of the agreement and has rights and may sue under the contract; an incidental beneficiary has no rights and may not sue to enforce them." *Estate of Willis v. Kiferbaum Const. Corp.,* 357 Ill.App.3d 1002, 1107–08, 294 Ill.Dec. 224, 830 N.E.2d 636 (1st Dist 2005). The mere fact that Company X receives a benefit as a result of a contract between Company Y and Company Z does not automatically make Company X a direct beneficiary who can sue on the Company Y—Company Z contract. Valley Air's argument that its receipt of a benefit from the Southaire—Central Flying contract means it can proceed directly against Central Flying even though it contracted only with Southaire is thus not persuasive.

**\*15** In this regard, the Seventh Circuit's decision in *Quinn v. McGraw–Hill Companies, Inc.,* 168 F.3d 331 (7th Cir.1999) is helpful. In *Quinn,* the plaintiff contended that he was the third party beneficiary of a contract between Standard and Poor and an issuer of bonds whereby Standard and Poor would rate bonds. The plaintiff asserted that "the parties must have known that investors like him were the beneficiaries of the rating contract" because "[t]his is just the way bond markets work ...." *Id.* at 334. Alternatively, he argued that he was an intended beneficiary of the obligation Standard & Poor had to monitor bonds.

The Seventh Circuit rejected these arguments, explaining:

> We do not doubt that investors derive valuable information from an S & P bond rating, both at the time of purchase and during the time they hold the bonds. The pertinent question, however, is whether the actual ... contract contains either express language identifying purchasers like Quinn by name or its functional equivalent. Here, Quinn practically concedes in this court that he cannot meet Illinois's high standard. He has not referred us to any text at all in the contract that would indicate, either explicitly or implicitly, the necessary intent to benefit. Instead, his argument is almost a structural one, relying on the way he thinks bond markets work. In our view, an Illinois court would find this insufficient as a matter of law to state a claim for breach as to a third-party beneficiary.

*Id.* at 334–35.

Here, as in the *Quinn* case, Valley Air's argument rests on its assertion about how the airplane rebuilding market works. The actual Southaire—Central Flying contract does not support his argument as it does not show that the contracting parties intended Valley Air (or the ultimate

purchaser of the plane) to be an intended beneficiary.

Third, Valley Air stresses that after Central Flying inspected the plane and started to effect repairs and improvements, Central Flying found out that Valley Air was the potential owner of the plane and sought input from Valley Air regarding the work. According to Valley Air, this means that Central Flying intended for Valley Air to benefit from the work and agreed that Valley Air could sue Central Flying if that work was subpar. The problem with this argument is that the court must focus on the time when a contract is executed, not when it is performed. *F.W. Hempel & Co., Inc. v. Metal World, Inc.,* 721 F.2d at 614 (subsequent communications between promisor and third party are irrelevant to third-party beneficiary analysis); *Corrugated Paper Products, Inc. v. Longview Fibre Co.,* 868 F.2d at 913 (the fact that the plaintiff engaged in negotiations with Longview, resulting in contract modifications regarding the product's delivery date, was irrelevant because this occurred after the underlying contract between the promisor and promisee was executed). Thus, events transpiring after the Southaire—Central Flying contract was executed cannot support Valley Air's contention that it was an intended third-party beneficiary.

**\*16** The court thus concludes that the record shows, as a matter of law, that Valley Air was at most an incidental beneficiary of the Southaire—Central Flying contract. This means that Central Flying is entitled to summary judgment as to Count IV.

### F. Negligent Misrepresentation Against Central Flying and Englert (Count V)

Central Flying and Englert suggest that Arkansas law governs Valley Air's negligent misrepresentation claim against them, which is unsurprising as Arkansas law does not recognize a cause of action for negligent misrepresentation. On the other hand, Valley Air contends that the tort of negligent misrepresentation under Illinois law is identical to the tort of constructive fraud under Arkansas law so Central Flying and Englert's argument is much ado about nothing.

### 1. Is a Choice of Law Analysis Necessary?

Before engaging in a choice of law analysis, the court must determine that there is a genuine conflict. *See Jean*

*v. Dugan,* 20 F.3d 255, 260 (7th Cir.1994). The Arkansas Supreme Court has expressly declined to recognize the tort of negligent misrepresentation. *South County, Inc. v. First Western Loan Co.,* 315 Ark. 722, 725, 871 S.W.2d 325 (Ark.1994). On the other hand, the Illinois Supreme Court "has recognized a duty to communicate accurate information" when: (1) the allegedly inaccurate information results in physical injury to a person or harm to property"; or (2) the defendant "is in the business of supplying information for the guidance of others in their business transactions." *Brogan v. Mitchell Int'l,* 181 Ill.2d 178, 183–84, 229 Ill.Dec. 503, 692 N.E.2d 276 (1998).

Valley Air concedes that any claim for negligent misrepresentation under Arkansas law would be doomed as it attempts to recast this claim as a request for relief based on a different tort (the Arkansas tort of constructive fraud). *See South County, Inc. v. First Western Loan Co.,* 315 Ark. at 725, 871 S.W.2d 325 (distinguishing between the torts of constructive fraud and negligent misrepresentation). Despite the fact that Valley Air's Arkansas constructive fraud claim appears for the first time in Valley Air's response to Central Flying/Englert's motion for summary judgment, the court will consider it as Central Flying/Englert address this claim on the merits.

Under Arkansas law, constructive fraud is "based upon a breach of a legal or equitable duty which the law declares to be fraudulent because of its tendency to deceive others, regardless of the moral guilt, purpose or intent of the fraudfeasor." *South County, Inc. v. First Western Loan Co.,* 315 Ark. at 726–27, 871 S.W.2d 325, *quoting Miskimins v. City Nat'l Bank,* 248 Ark. 1194, 1204, 456 S.W.2d 673 (Ark.1970). This tort is not the same as the Illinois tort of negligent misrepresentation. Accordingly, the court will conduct a choice of law analysis for Count V.

### 2. Choice of Law Analysis—Illinois or Arkansas?
In a diversity case, a federal court must follow the conflict of laws principle of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Illinois Supreme Court uses the Restatement (Second) of Conflicts of Law's "most significant relationship" test to resolve choice of law disputes. *See, e.g., Esser v. McIntyre,* 169 Ill.2d 292, 297–98, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (Ill.1996). When determining what state has the most significant relationship to a plaintiff's negligent misrepresentation claim, relevant factors include: (1) the place where Valley Air acted in reliance on the

defendant's representations; (2) the place where Valley Air received the representations; (3) the place where the defendant made the representations; (4) the domicile, residence, nationality, place of incorporation and place of business of the parties; (5) the place where a tangible thing which is the subject of the transaction (here, the airplane) was situated; and (6) the place where Valley Air was to render performance under a contract which it was induced to enter by the defendant's false representations. *See* Restatement (Second) of Conflict of Laws § 148 (1971) (fraud and misrepresentation); *see also Barbara's Sales, Inc. v. Intel Corp.,* 227 Ill.2d 45, 61–62, 316 Ill.Dec. 522, 879 N.E.2d 910 (Ill.2007).

**\*17** Central Flying and Englert note that the plane was in Arkansas while Central Flying was working on it, Valley Air inspected the plane in Arkansas, the sale of the plane was closed in Arkansas, and Valley Air took possession of the plane in Arkansas. Valley Air has not comment on the choice of law factors and thus has waived any arguments relating to these factors. However, Valley Air is an Illinois corporation and the Cosyns appear to have communicated with Central Flying from their home base in Illinois. Given the weight of Arkansas' connections with the alleged misrepresentations about the plane's condition, the court declines to find that Illinois law applies simply because Valley Air is located in Illinois. The court will, therefore, apply Arkansas law to Count V.

### 3. Constructive Fraud Under Arkansas Law
As noted above, under Arkansas law, "[c]onstructive fraud is a type of fraud based on a breach of a legal or equitable duty which the law declares to be fraudulent because of its tendency to deceive others, regardless of the moral guilt, purpose, or intent of the perpetrator." *Evans Indus. Coatings, Inc. v. Chancery Court of Union County, Third Div.,* 315 Ark. 728, 733, 870 S.W.2d 701 (Ark.1994). Central Flying/Englert contend that any claim for constructive fraud under Arkansas law fails as a matter of law because Central Flying contracted with Southaire, so Valley Air was not in privity with Central Flying. Based on the lack of privity, Central Flying and Englert conclude that they had no duty to Valley Air, and thus cannot be liable for constructive fraud. Valley Air, however, contends that Central Flying and Englert had a duty to provide accurate information about the plane's condition and reveal that a proper Phase I–V inspection had not been performed.

Constructive fraud can exist when the parties have a confidential or special relationship which creates "a duty

to speak and clarify information upon which others might rely." *Archer Daniels Midland Co. v. Beadles Enterprises, Inc.,* 367 Ark. 1, 83–84, 238 S.W.3d 79 (Ark.2006). "The question as to what duty is owed is always a question of law." *Allen v. Allison,* 356 Ark. 403, 415, 155 S.W.3d 682 (Ark.2004). Valley Air's constructive fraud claim appears to flow from Central Flying's alleged breach of the Southaire–Central Flying Contract. It is unclear whether the Arkansas Supreme Court would find that a breach of contract can form the basis of a constructive fraud claim. *See Quinney v. Pittman,* 320 Ark. 177, 182–86, 895 S.W.2d 538 (Ark.1995) (affirming judgment in favor of home purchaser on constructive fraud count based on a breach of contract between home inspector and home purchaser); *cf. Evans Indus. Coatings, Inc. v. Chancery Court of Union County, Third Div.,* 315 Ark. at 704, 870 S.W.2d 390 (a contractual relationship cannot create the necessary relationship of trust or confidence needed to support a cause of action for constructive fraud).

Nevertheless, as stressed by Central Flying and Englert, Valley Air was not a party to the Central Flying–Southaire contract that was allegedly breached. Valley Air thus needs to identify a legal or equitable duty requiring Central Flying and Englert to speak. In an effort to do so, Valley Air directs the court's attention to four Arkansas cases. Three of these cases involve parties who entered into a contract and thus were in privity. Valley Air and Central Flying/Englert, however, are not in privity because the relevant contract that was allegedly breached was between Southaire and Central Flying, and Valley Air was not a party to that contract.[11] *See Beatty v. Haggard,* 87 Ark.App. 75, 77, 184 S.W.3d 479 (Ark.App.2004) (after entering into a contract to purchase real property with sellers of that property, purchasers sued sellers based on constructive fraud); *Archer Daniels Midland Co. v. Beadles Enterprises, Inc.,* 367 Ark. at 83–84 (hog farm sued its soybean meal supplier after supplier sold the farm potentially contaminated meal which set a chain of events in motion resulting in the death of 2600 hogs); *Quinney v. Pittman,* 320 Ark. 177, 182–86, 895 S.W.2d 538 (Ark.1995) (home purchasers sued home inspector for constructive fraud based on a breach of an underlying contract).

[11] To the extent that Valley Air had a direct contractual relationship with Central Flying due to contracts between these parties to perform certain work, these contracts dealt with detail work or upgrades to the plane, as opposed to Central Flying's duty to perform a proper Phase I–V inspection and complete repair work identified by that inspection per the Central Flying–Southaire contract. Thus, for the purposes of Valley Air's constructive fraud claim, the relevant contract is between Central Flying and Southaire.

**\*18** The remaining case cited by Valley Air involved parties who had an explicit legal duty to each other. *See Downum v. Downum,* 101 Ark.App. 243, 248, 274 S.W.3d 349 (Ark.App.2008) (wife had legal duty to disclose certain information to husband when providing information to the court overseeing the parties' divorce). Valley Air has not identified the basis for any specific legal or equitable duty under Arkansas law.

Thus, Valley Air's constructive fraud claim is based on the alleged breach of the Southaire–Central Flying contract but it has not pointed to any authority showing that Central Flying or Englert had a duty to speak. The court is not required to construct arguments for a party to allow it to withstand a summary judgment motion. Accordingly, the court finds that Central Flying and Englert are entitled to summary judgment as to Count V.

### III. Conclusion

Southaire and Brunner moved for summary judgment as to Counts I, II, and III. Their motion [# 196] is denied as to Count I (breach of contract against Southaire) and Count II (common law fraud against Southaire and Brunner) and granted as to Count III (Illinois Consumer Fraud Act against Southaire and Brunner).

Central Flying and Englert have moved for summary judgment as to Counts IV, V, and VII, but not Count VI. Their motion [# 191] is granted as to Count IV (breach of contract under a third party beneficiary theory against Central Flying), Count V (negligent misrepresentation against Central Flying and Englert), and Count VII (Illinois Consumer Fraud Act against Central Flying and Englert).

Thus, the following counts will be tried: Count I (breach of contract against Southaire), Count II (common law fraud against Southaire and Brunner), and Count VI (common law fraud against Central Flying and Englert). A status hearing is set for April 30, 2009, at 11:00 a.m., at which time the parties shall be prepared to agree to a firm trial date and other related dates.

In addition, the docket currently lists Stephen Cosyns as a plaintiff and counter-defendant. The clerk is directed to correct the docket to remove him as a separate party.

**Valley Air Service v. Southaire, Inc., Not Reported in F.Supp.2d (2009)**

**All Citations**                                    Not Reported in F.Supp.2d, 2009 WL 1033556

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.